## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| ANDREW GORDON, TAVIS MCNEIL, DONALD WRIGHTON, NICHOLAS COLE, JACOB GRISSON, and DAWN DEWEY, *on behalf of themselves and others similarly situated*, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 2:14-cv-03365-DCN |
| vs. | ) ) ) | |
| TBC RETAIL GROUP, INC. *d/b/a* TIRE KINGDOM, | ) ) ) | **ORDER** |
| Defendant. | ) ) ) | |

This matter is before the court on plaintiffs' motion for conditional class certification. Plaintiffs seek conditional certification of a putative class pursuant to the collective action provision of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). For the reasons set forth below, the court grants plaintiffs' motion.

## I.  BACKGROUND

Plaintiffs Andrew Gordon, Tavis McNeil, Donald Wrighton, Nicholas Cole, Jacob Grisson, and Dawn Dewey (collectively "Plaintiffs") were employed by defendant TBC Retail Group, Inc., d/b/a Tire Kingdom ("TBC") as mechanics in TBC's South Carolina stores. Pls.' Compl. ¶ 1. Plaintiffs and other mechanics employed by TBC during the relevant time period were responsible for inspecting, diagnosing, repairing, and servicing automobiles. Id. at ¶¶ 13 and 14. All mechanics employed by TBC during the relevant time period were, and continue to be, paid pursuant to the same compensation plan. Pls.' Compl. ¶ 16; Def.'s Answer ¶¶ 15, 16,

19, 22, 23, and 31. Under this plan, a mechanic's total compensation is composed of two basic components. First, each mechanic is paid an amount determined by multiplying the particular mechanic's "flat rate"—an hourly pay rate assigned to each mechanic based on that mechanic's particular skill, experience, and certifications—by the mechanic's "turned hours"—a pre-established amount of time designated by TBC for each mechanical task—for all tasks completed by the mechanic during the relevant pay period. Def.'s Answer at ¶ 16; Def.'s Resp. 5. Thus, this "turned hours" component of a mechanic's compensation (hereinafter, "Turned Hours Pay") does not account for the actual time spent working on a particular task or during the pay period overall. Def.'s Resp. 5. Instead, Turned Hours Pay is based exclusively on the number of tasks completed and the pre-assigned "turned hours" for such tasks. Id. at 5–6. The same measure of "turned hours" used to form a mechanic's Turned Hours Pay for a particular task is used as the basis for the labor costs charged to the customer[1] for that task, though the rates paid by the customers are, of course, greater than mechanics' "flat rates." Id. at 5.

When the amount of a mechanic's Turned Hours Pay earned over a given pay period is less than one and one-half times the statutory minimum wage[2] multiplied by the mechanic's actual hours worked during the same period, TBC pays a supplemental amount, referred to as "differential pay." Def.'s Answer ¶ 19; Def.'s Resp. 6. This "differential pay" is set at whatever amount is needed to render the mechanic's total compensation—i.e. Turned Hours Pay plus "differential pay"—

---

[1]    Plaintiffs allege that managers regularly reduced the turned hours charged to the customers in order to facilitate sales, thereby reducing the turned hours earned by the mechanics. Cole Aff. ¶ 9; Gordon Aff. ¶ 7; McNeil Aff. ¶ 11.

[2]    As a matter of caution, TBC set a minimum rate of $11.02 per hour, though one and one-half times the minimum wage of $7.75 per hour is only $10.88 per hour. Def.'s Answer ¶ 19.

equal to $11.02 per hour for all actual hours worked during the period.  Def.'s Answer ¶ 19; Def.'s Resp. 6.  As a result, if a mechanic's "turned hours" fall below a certain percentage[3] of their actual hours, TBC compensates the mechanic as if they earned a straightforward wage of $11.02 per hour.  This "differential pay" is designed to insure that mechanics always earn at least one and one-half time the statutory minimum wage for all actual hours worked.  Def.'s Answer ¶ 19; Def.'s Resp. 6.

On August 20, 2014, plaintiffs filed their original complaint against TBC on behalf of themselves and "all other similarly situated employees including but not limited to each and every mechanic who suffered damages as a result of [TBC]'s" FLSA violations.  Pls.' Complaint ¶ 2.  Plaintiffs allege that TBC violated the minimum wage and overtime provisions of the FLSA by utilizing a compensation plan that did not provide compensation at a rate of one and one-half times their regular rate of pay when plaintiffs and similarly situated employees worked more than forty (40) hours in a workweek.  Id. at ¶ 23.  On October 27, 2014, TBC filed its answer to plaintiffs' complaint, arguing that plaintiffs and other similarly situated employees were paid under a bona fide flat-rate commission plan and were therefore not entitled to overtime compensation pursuant to Section 7(i) of the FLSA.  Def.'s Answer ¶¶ 15–16.  On April 15, 2015, plaintiffs filed the instant motion for conditional class certification, seeking authorization to proceed as a collective action on behalf of "all current and former [m]echanics who worked during the time period beginning August 20, 2011 through the present."  Pls.' Mot. ¶ 8.  Plaintiffs also ask the court to require TBC to provide the names, addresses, and telephone numbers of

---

[3]    This percentage would depend on the particular plaintiff's "flat rate" and the statutory minimum wage, though that appears to have been $7.75 per hour at all times relevant to this action.

all potential opt-in plaintiffs, and to authorize the mailing of the proposed notice to all

potential opt-in plaintiffs.  Id. at 3.

## II.  DISCUSSION

### A.  Ordinary Standard

Under the FLSA, plaintiffs may institute a collective action against their

employer on behalf of themselves and other similarly situated employees.  Section

216(b) of the FLSA states,

> An action . . . may be maintained against any employer . . . in any
> Federal or State court of competent jurisdiction by any one or more
> employees for and in behalf of himself or themselves and other
> employees similarly situated.  No employee shall be a party plaintiff to
> any such action unless he gives his consent in writing to become such
> a party and such consent is filed in the court in which such action is
> brought.

29 U.S.C. § 216(b).  The mechanism outlined in § 216(b) is designed to facilitate the

efficient adjudication of similar claims by "similarly situated" employees by

permitting the consolidation of individual claims and the pooling of resources in

prosecuting such actions against their employers.  See Hoffmann–La Roche Inc. v.

Sperling, 493 U.S. 165, 170 (1989); LaFleur v. Dollar Tree Stores, Inc., 2014 WL

934379, at *2 (E.D. Va. Mar. 7, 2014); Lynch v. United Servs. Auto. Ass'n, 491 F.

Supp. 2d 357, 367 (S.D.N.Y. 2007).  In deciding whether the named plaintiffs in an

FLSA action are "similarly situated" to other potential plaintiffs, courts generally

employ a two-stage approach.  Purdham v. Fairfax Cnty. Pub. Sch., 629 F. Supp. 2d

544, 547 (E.D. Va. 2009) (quoting Parker v. Rowland Express, Inc., 492 F. Supp. 2d

1159, 1164 (D. Minn. 2007)); see also Pelczynski v. Orange Lake Country Club, Inc.,

284 F.R.D. 364, 367 (D.S.C. 2012); Simons v. Pryor's, Inc., No. 3:11–cv–0792, 2011

WL 6012484, at * 1 (D.S.C. Nov. 30, 2011).

4

The first step in this process, which is the subject of the instant motion, is the "notice," or "conditional certification," stage. <u>Purdham</u>, 629 F. Supp. 2d at 547. With regard to this conditional certification stage, "[t]he Supreme Court has held that, in order to expedite the manner in which collective actions under the FLSA are assembled, 'district courts have discretion[,] in appropriate cases[,] to implement . . . § 216(b) . . . by facilitating notice to potential plaintiffs.'" <u>Purdham</u>, 629 F. Supp. 2d at 547 (quoting <u>Hoffman–La Roche, Inc.</u>, 493 U.S. at 169); <u>see</u> <u>Genesis Healthcare Corp. v. Symczyk</u>, 133 S.Ct. 1523, 1530 (2013) (citation omitted) ("'[C]onditional certification' does not produce a class with an independent legal status, or join additional parties to the action. The sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court." (citing § 216(b))). At this stage, the plaintiff must demonstrate that the proposed class members are "similarly situated" and that notice is "appropriate." <u>Id.</u> at 548. Notice is "appropriate" where the proposed class members' claims "share common underlying facts and do not require substantial individualized determinations for each class member." <u>MacGregor v. Farmers Ins. Exch.</u>, No. 2:10-cv-03088, 2012 WL 2974679, at *2 (D.S.C. July 20, 2012). Ordinarily, the plaintiff's burden at this initial stage is fairly lenient, requiring only a modest factual showing that members of the proposed class are "victims of a common policy or plan that violated the law." <u>Regan v. City of Charleston, S.C.</u>, No. 2:13-cv-3046, 2014 WL 3530135, at *2 (D.S.C. July 16, 2014); <u>Long v. CPI Sec. Sys., Inc.</u>, 292 F.R.D. 296, 298–99 (W.D.N.C. 2013); <u>Essame v. SSC Laurel Operating Co. LLC</u>, 847 F. Supp. 2d 821,

5

824–25 (D. Md. 2012); Steinberg v. TQ Logistics, Inc., No. 0:10-cv-2507, 2011 WL
1335191, at *1 (D.S.C. Apr. 7, 2011); Purdham, 629 F. Supp. 2d at 547–48. Courts
determine whether conditional certification is warranted by examining the parties'
pleadings and affidavits. Schmidt v. Charleston Collision Holdings Corp., No. 2:14-
cv-01094, 2015 WL 3767436, at *3 (D.S.C. June 17, 2015); Steinberg, 2011 WL
1335191, at *1.

        "Second, after the court has conditionally certified the class, the potential
class members have been identified and notified, and discovery has been completed,
'a defendant may then move to decertify the collective action, pointing to a more
developed record to support its contention that the plaintiffs are not similarly
situated . . .'" Regan, 2014 WL 3530135, at *3 (quoting Pelczynski, 284 F.R.D. at
368); Purdham, 629 F. Supp. 2d at 547. At this "decertification stage" the court
applies a heightened, fact-specific standard to the "similarly situated" analysis,
Regan, 2014 WL 3530135, at *3, and considers various additional factors, including:
(1) the disparate factual and employment settings of the individual plaintiffs; (2) the
various defenses available to defendants that appear to be individual to each plaintiff;
and (3) fairness and procedural considerations. Id. at *3.

        **B.  Intermediate Standard**

        Although defendant all but abandoned this argument at the hearing, defendant
asked the court to deviate from this approach and review plaintiffs' motion for
conditional certification using a heightened, "intermediate standard." Def.'s Resp.
9–11. Despite the ordinarily lenient standard at the conditional certification stage,
courts have occasionally applied an intermediate standard, which requires a more

6

stringent showing in cases where some, but not all, discovery has been completed. See MacGregor, 2012 WL 2974679, at *3; McClean v. Health Sys., Inc., 2011 WL 6153091, at *4 (W.D. Mo. Dec. 12, 2011); Blaney v. Charlotte-Mecklenburg Hosp. Auth., 2011 WL 4351631, at *5 (W.D.N.C. Sept. 16, 2011).  Most district courts within this circuit hold that the intermediate standard is generally inappropriate when relatively little discovery has taken place.  See, e.g., Holmes v. Charleston Ret. Investors, LLC, No. 2:13-cv-1713, 2014 WL 10122868, at *3 (D.S.C. Feb. 25, 2014) ("[A]lthough the parties have completed some discovery, including taking several depositions, it appears to the [c]ourt that significant additional discovery remains . . . Accordingly, the [c]ourt will apply the more lenient standard . . ."); Curtis v. Time Warner Entm't-Advance/Newhouse P'ship, No. 3:12-cv-2370, 2013 WL 1874848, at *3 (D.S.C. May 3, 2013) ("Where extensive discovery remains, courts usually apply the more lenient standard applicable at the first step."); Long, 292 F.R.D. at 300 ("[T]he limited precertification discovery contemplated . . . in this case, and performed by the parties, does not rise to the level of discovery performed by parties in other cases where courts applied the intermediate standard."); Essame, 847 F. Supp. 2d at 826 ("[Defendant] has identified no authority from this jurisdiction standing for the proposition that courts may disregard the traditional two-stage analysis where the parties have completed 'some' discovery.").

In this case, very little discovery has taken place.  The only discovery requests made to this point are plaintiffs' first set of interrogatories and first set of document requests.  See ECF No. 15.  This level of discovery is clearly insufficient to justify use of the intermediate standard under the general rule, as it appears that significant

additional discovery remains. <u>See</u> <u>Holmes</u>, 2014 WL 10122868, at *3; <u>Curtis</u>, 2013 WL 1874848, at *3.  Though certain decisions in this circuit can be read to have applied the intermediate standard after only limited discovery—notably, this court's decision in <u>MacGregor</u> and the Western District of North Carolina's decision in <u>Blaney</u>—the minimal discovery in this case does not even reach the level found in those exceptional cases, where the parties had taken at least some depositions. <u>Blaney</u>, 2011 WL 4351631, at *5 (stating that "the parties exchanged interrogatories and documents and took a number of [p]laintiffs' depositions in advance of the [] deadline [for filing the motion for class certification]," and "[t]he [c]ourt cannot close its eyes to the amount of discovery already performed in this action"); <u>MacGregor</u>, 2012 WL 2974679, at *3 (mentioning two depositions plaintiffs used in support of their arguments).  Thus, even if this case presented the sort of exceptional circumstances that justified the application of the intermediate standard in <u>MacGregor</u> and <u>Blaney</u>, the parties have engaged in such little discovery that the standard would still be inappropriate.

Moreover, there is no indication that such exceptional circumstances are present in this case.  Unlike in <u>MacGregor</u>, plaintiffs did not utilize, much less rely upon, discovered information in support of their initial motion,[4] which was filed before plaintiffs even received defendant's responses to their discovery requests.  <u>See</u> <u>MacGregor</u>, 2012 WL 2974679, at *3 (holding that that the plaintiff's reliance on evidence produced during discovery justified the use of the intermediate standard, reasoning that it would be inequitable to allow the plaintiff to utilize the discovered

---

[4]     Plaintiffs' reply memorandum does reference a set of documents entitled "Terms of Employment Notice" which appear to have been produced during discovery.  Pls.' Reply 4 n.2. However, these documents appear in a footnote and are not central to plaintiffs' argument.

information while still benefiting from the lenient conditional certification standard). This case is also distinguishable from <u>Blaney</u>, where the parties specifically agreed to a discovery plan which contemplated a period of discovery that would precede the plaintiff's motion for conditional certification.  <u>See Blaney</u>, 2011 WL 4351631, at *5 (stating that "[t]he critical point is that the parties agreed and anticipated that some discovery was to occur prior to the [c]ertification [m]otion coming due, and the [c]ourt adopted this discovery time-frame," and "the [c]ourt cannot ignore the fact that the parties requested, and engaged in, some discovery on the certification issue"). Though not explicitly stated by the <u>Blaney</u> court, this agreement suggests that the parties understood, or at least, should have understood, that information produced by such discovery would be scrutinized in connection with the plaintiff's motion for conditional certification.  <u>See Id.</u>  Here, there was certainly no agreed upon period of pre-certification discovery, nor is there any evidence that plaintiffs understood that the information produced by such discovery would be scrutinized by this court at the conditional certification stage.  Even assuming plaintiffs' discovery requests were designed to uncover class certification related evidence, simply engaging in discovery that might produce such evidence does not indicate an understanding that it will be examined at the conditional certification stage, especially because such evidence is normally reviewed at the decertification stage.  In light of the minimal discovery completed in this case and the absence of any exceptional circumstances justifying an examination of the information produced by such discovery, the court declines defendant's request to utilize the intermediate standard and will proceed to assess plaintiffs' motion under the ordinary, "fairly lenient" standard.

### C. Similarly Situated

Plaintiffs ask the court to conditionally certify a class of "all current and former [m]echanics who worked during the time period beginning August 20, 2011 through the present."[5]  Pls.' Mot. ¶ 8.  Plaintiffs claim that they, along with all other mechanics employed by defendant during the class period, shared the same job duties, regularly worked over forty hours a week, and were not paid overtime pursuant to the same compensation plan.  Pls.' Br. 2, 5–6.  Plaintiffs argue that these commonalities demonstrate that the proposed class members are similarly situated.  Id.

TBC does not deny that all mechanics were paid under the same compensation plan but nevertheless argues that class certification would be inappropriate, because TBC's primary defense at trial—that the compensation plan constitutes a bona fide flat-rate commission plan under § 7(i) of the FLSA—will render individualized, fact-specific inquiries necessary in deciding each class member's claim.  Def.'s Resp. 16.

FLSA § 7(i) provides that:

> No employer shall be deemed to have violated [the overtime provisions] of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under the [minimum wage section] of this title, and (2) more than half his compensation for a representative period

---

[5]    TBC argues that plaintiffs' have not sufficiently defined the class, relying, almost exclusively on Prince v. Cato Corp., 2015 WL 1040713 (N.D. Ala. Mar. 10, 2015).  Def.'s Resp. 15–16.  In Prince, the court noted that the plaintiffs' "failure to clearly describe the potential class is reason enough to deny the motion."  Prince, 2015 WL 1040713, at *2 n.1.  However, Prince offered no support for this proposition and it was not central to the court's holding.  See Id. at *9–10 (holding that the evidence did not support conditional certification of a nationwide class).  Moreover, plaintiffs' description of the class in this case is sufficiently clear given the nature of their claims.  Plaintiffs claim that the nature of defendant's compensation plan, which appears to have applied to all mechanics employed by defendant, gave rise to FLSA violations.  Pls.' Br. 2, 5–6.  Thus, the court finds that plaintiffs have sufficiently indicated their intent to include all mechanics "nationwide"—unlike in Prince where "none of the declarations, or documentary evidence, support[ed] the conditional certification of a nationwide class."  Id. at *9.

10

(not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). TBC contends that due to the "'highly individualized nature' of claims for overtime involving the § 7(i) defense, which, in this case, would require a review of <u>each</u> class member's actual time records, turned-hours records and pay records—courts have made clear that commissioned employees' claims under § 7(i) cannot proceed as a collective action."[6] Def.'s Resp. 17 (emphasis in original).

As an initial matter, TBC's argument is premature at the conditional certification stage. TBC relies on <u>Beauperthuy v. 24 Hour Fitness USA, Inc.</u>, 772 F. Supp. 2d 1111, 1126 (N.D. Cal. 2011), and <u>Johnson v. TGF Precision Haircutters, Inc.</u>, 2005 WL 1994286, at *6 (S.D. Tex. Aug. 17, 2005), to demonstrate the inherently individualized nature of the § 7(i) inquiry. <u>Id.</u> at 17–19. However, both <u>Johnson</u> and <u>24 Hour Fitness</u> were decided at the decertification stage <u>after</u> conditional certification, where plaintiffs must meet a higher burden of proof and courts review several factors not addressed at the conditional certification stage, including "the various defenses available to defendant which appear individual to each plaintiff." <u>24 Hour Fitness</u>, 772 F. Supp. 2d at 1116–18; <u>Johnson</u>, 2005 WL 1994286, at *1.

---

[6]    TBC also argues that the burden created by these individualized, fact-specific inquiries would be exacerbated by the variety of the proposed plaintiffs' compensation plans. Def.'s Resp. 18. TBC points to the fact that some, but not all, of plaintiffs' affidavits contained allegations that their "turned hours" were routinely and unilaterally reduced by managers in order to facilitate sales. Def.'s Resp. 18 n.13. Though this may have some bearing on the similarly situated analysis, discussed below, this alleged practice by TBC's managers cannot sensibly be characterized as part of plaintiffs' compensation plan.

   With respect to other differences in potential class member's pay, the court notes that while each class member's actual hours, "flat-rate," and commissions as a percentage of total pay will vary, courts have held that "[d]ifferences as to time actually worked, wages actually due[,] and hours involved are, of course, not significant" in determining whether proposed class members are similarly situated. <u>Pelczynski</u>, 284 F.R.D. at 368 (citing <u>De Luna-Guerrero v. N. Carolina Grower's Ass'n, Inc.</u>, 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004)).

TBC nevertheless analogizes the instant case to Holt v. Rite Aid Corp., 333 F. Supp. 2d 1265 (M.D. Ala. 2004), in which the court refused to conditionally certify the proposed class because "substantial evidence" indicated that the application of an FLSA defense would require individualized inquiries into the daily tasks of each proposed class member. Holt, 333 F. Supp. 2d. at 1274–75 ("[S]ubstantial evidence has been presented which indicates to this court that if the case were conditionally certified as a collective action at this stage, the court would have to inquire at a second stage as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the [p]laintiffs, and then, on the merits, whether they had suffered an FLSA violation because they were not eligible for overtime compensation."); see also Pelczynski, 284 F.R.D. at 369 (declining to conditionally certify a class after determining that "[the court] must eventually conduct an individualized assessment of each of [p]laintiffs' claims"). The court in Holt, however, had the benefit of "fairly extensive evidence on the issue of whether putative class members [were] similarly situated." Holt, 333 F. Supp. 2d at 1274. As discussed above, the available evidence in this case is extremely limited, thus, it would be inappropriate to inquire into the individualized nature of the § 7(i) defense at this stage.

To the extent defendant's § 7(i) defense is relevant, plaintiffs have still provided at least a "modest factual showing" that liability will not depend on individualized, fact-specific inquiries. The courts in 24 Hour Fitness and Johnson both held that application of the § 7(i) defense would require a highly individualized inquiry that could not be accomplished with common proof, because the court would

need to calculate the separate elements of the § 7(i) defense—i.e. the regular rate of pay, the hours worked, and total commissions as a percentage of total pay over each representative period—for each week that each plaintiff was employed.  See 24 Hour Fitness, 772 F. Supp. 2d  at 1126–27; Johnson, 2005 WL 1994286, at * 6 ("Functionally . . . § 7(i) is in fact a highly individualized defense because its application requires week-by-week and other periodic calculations (e.g., not less than monthly on one part of the formula) specific to each individual [p]laintiff and his or her particular circumstances.").  This reasoning assumes that liability will turn on whether or not the calculations of each plaintiff's pay fall within the quantitative requirements of § 7(i).

However, if it were possible to demonstrate that the § 7(i) defense was inapplicable without reference to such calculations, the reasoning in 24 Hour Fitness and Johnson would not apply.  Here, plaintiffs challenge defendant's characterization of their pay as bona fide "commissions" under FLSA § 7(i).  Pls.' Br. 3–4 (arguing that defendant's mischaracterized their pay pursuant to a "sham" commission plan).  If plaintiffs' challenge is successful, no portion of any class member's pay will even qualify as a "commission" within the meaning of § 7(i), and the defense will be decided without engaging in the individualized inquiries that motivated the 24 Hour Fitness and Johnson decisions.  Even if plaintiffs' challenge is unsuccessful, individualized inquiries might still be unnecessary, as plaintiffs do not appear to dispute the calculations of their hours, rate of pay, commissions, or other relevant metrics.  See Def.'s Answer ¶¶ 16 and 19 (averring that, at any given time, at least 50

% of plaintiffs' pay constituted commissions, and plaintiffs made at least one and one-half times the minimum wage for all hours worked in a workweek).

The court recognizes that the plaintiffs in 24 Hour Fitness offered a similar argument that class certification was appropriate because the payments they received "were not in fact bona fide commissions under § 7(i), and [] the § 7(i) defense could be defeated via common proof of this fact." 24 Hour Fitness, 772 F. Supp. 2d at 1127. The Northern District of California characterized this as a merits argument and rejected it as premature. Id. ("[W]hether plaintiffs actually meet the criteria of an FLSA exemption is irrelevant to a determination of whether they are similarly situated."). Regardless of whether or not this rationale was appropriate in 24 Hour Fitness, it would mischaracterize the argument in this case. Though the merits of plaintiffs' challenge are irrelevant in determining whether the proposed class members are similarly situated, the ways in which that challenge might be proven or defeated, and how the success or failure of that challenge will affect the ultimate disposition of the case, are highly relevant to the similarly situated analysis. LaFleur, 30 F. Supp. 3d at 468 ("[C]ourts have determined if potential class members are similarly situated by assessing the existence of 'issues common to the proposed class that are central to the disposition of the FLSA claims and that such common issues can be substantially adjudicated without consideration of facts unique or particularized as to each class member.'").

Moreover, adopting an interpretation of the "similarly situated" standard that could be defeated any time defendants offered a § 7(i) defense would effectively deny the benefits of the FLSA collective action provisions to all employees being paid

pursuant to a purported "commission" plan.  This result appears inconsistent with the remedial goals of the FLSA.  <u>Hoffmann-La Roche Inc.</u>, 493 U.S. 165 at 173 (stating that "Congress left intact the 'similarly situated' language providing for collective actions" and "[t]he broad remedial goal of the statute should be enforced to the full extent of its terms").

Thus, TBC's § 7(i) defense does not preclude plaintiffs from making a modest factual showing that the proposed class members are similarly situated.   It is certainly possible that further discovery may clarify the contours of plaintiffs' claims in such a way that it becomes clear the parties are not similarly situated.  For instance, it may be that the central issue is not whether or not the compensation plan itself qualified as a bona fide commission plan under § 7(i), but rather, whether the acts of specific managers[7] or the actual application of the §7 (i) commission exception to particular individuals violated the FLSA.  At that time, defendant will have an opportunity to bring a motion for decertification, but as this juncture, there appears to be sufficient support for plaintiffs' contention that liability can be determined without individualized, fact-specific inquiries.

Ultimately, the court is satisfied that plaintiffs' have made a "modest factual showing" that the proposed class members were "victims of a common policy or plan that violated the law," as required by <u>Purdham</u>, 629 F. Supp. 2d at 547–48.   The essence of plaintiffs' claim is that, pursuant to a common compensation plan, defendant denied plaintiffs and proposed class members overtime pay in violation of the FLSA.  <u>See</u> Pls.' Reply 2–4.  Plaintiffs' assertion that all mechanics were paid

---

[7]     Plaintiffs' allegation that managers regularly reduced their turned hours in order to facilitate sales appears to be the most likely way in which the acts of specific managers may be relevant.  <u>See</u> Cole Aff. ¶ 9; Gordon Aff. ¶7; McNeil Aff. ¶ 11.

pursuant to the same compensation plan is supported by their own affidavits, Cole Aff. ¶ 9, Gordon Aff. ¶ 10, McNeil Aff. ¶ 13, Dewey Aff. ¶ 10, as well as defendant's admissions, which essentially state that plaintiffs and similarly situated employees were compensated pursuant to a bona fide flat-rate commission plan.  Def.'s Ans. ¶¶ 15, 16, 19, 22, 23, and 31; see also Def.'s Resp. 5 ("[TBC] hires mechanics to perform [] auto services, and pays them a commission.").  Plaintiffs' complaint and affidavits also support their claim that they, along with other class members, regularly worked over forty hours a week without receiving overtime pay, Pls.' Compl. ¶ 21; Gordon Aff. ¶ 10, McNeil Aff. ¶ 13, Dewey Aff. ¶ 10, which TBC does not appear to dispute.  Def.'s Answer ¶ 15 (admitting that "[p]laintiffs and other similarly situated employees worked more than forty (40) hours in a workweek" and that the overtime calculations were not applicable).  Thus, plaintiffs' pleadings and affidavits demonstrate that "the proposed class members raise a similar legal issue as to coverage, exemption, [] nonpayment[,]  minimum wages[,] or overtime arising from at least a manageably similar factual setting."  De Luna-Guerrero, 338 F. Supp. 2d at 654.

### D.  TBC's Likelihood of Success on the Merits

TBC also urges the court to deny conditional certification based on the Eastern District of Virginia's decision in Herrera v. TBC Corp., 18 F. Supp. 2d 739 (E.D. Va. 2014), granting summary judgment to TBC Corp. and finding that the same flat rate compensation plan at issue in this case was compliant with § 7(i) of the FLSA.  Def.'s Resp. 3, 11.  TBC notes that a recent investigation of its South Florida stores, conducted by the U.S. Department of Labor, Wage and Hour Division, also

found no violations. <u>Id.</u> at 3. TBC argues that <u>Herrera</u> and the Department of Labor investigation show that plaintiffs' claims are unlikely to succeed at trial; therefore class certification is improper, and likely to result in judicial inefficiency and unnecessary costs. <u>Id.</u> at 8 ("Plaintiffs must show a common policy or plan that <u>violates the law</u> . . . These [p]laintiffs clearly cannot do so, as the common commission-based pay plan [p]laintiffs must seek to attack is one already adjudged to comply with the FLSA.") (emphasis in original).

TBC's argument is premature at this stage. Though some courts have held that class certification should be denied when a defendant employer shows that it is likely to succeed at trial, <u>Amendola v. Bristol-Myers Squibb Co.</u>, 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008), this position has been widely rejected—even in the Southern District of New York, where it was first announced. <u>See, e.g.</u> <u>McLawhorn v. Cnty. of Wayne, N.C.</u>, 2014 WL 5810375, at *2 & n.1 (E.D.N.C. Nov. 7, 2014) (stating that the defendant's merits "argument is appropriate for a dispositive motion, but cannot form the basis of this Court's decision on this matter" and specifically rejecting the reasoning in <u>Amendola</u>); <u>Lloyd v. J.P. Morgan Chase & Co.</u>, 2013 WL 4828588, at *4 & n.6 (S.D.N.Y. Sept. 9, 2013) (stating that "the law is clear that courts should not weigh the merits at this point in the litigation" and explaining in that <u>Amendola</u>'s reasoning was at odds with the Second Circuit's recent clarification of the conditional certification standard); <u>Burdine v. Covidien, Inc.</u>, 2011 WL 2976929, at *2 (E.D. Tenn. June 22, 2011) ("While courts have occasionally considered the merits of an FLSA claim when ruling on a motion for conditional certification . . . the better approach in this case asks only whether the named

[p]laintiffs are similarly situated to the potential plaintiffs."); Davis v. Charoen Pokphand (USA), Inc., 303 F. Supp. 2d 1272, 1277 n.6 (M.D. Ala. 2004) ("[The] class-notification stage is not the time to resolve the merits of an FLSA suit."). In rejecting a merits-based analysis, the Burdine court specifically addressed the often cited language requiring "a modest factual showing that the [proposed class members] were victims of a common policy that violated the law." Burdine, 2011 WL 2976929, at *3. The court held that—contrary to TBC's argument—the phrase "violated the law" should not be read to require a showing that plaintiffs are likely to prevail on the merits. Id.

Aside from the impropriety of TBC's merits argument, neither Herrera nor the Department of Labor investigation is necessarily indicative of TBC's likelihood to succeed at trial. While Herrera focused on the requirement that there be "some element of proportionality" between employees' commissions and the prices charged to customers, Herrera, 18 F. Supp. 3d at 747, the proportionality requirement is not the only reason a purported commission plan may not qualify as bona fide under FLSA § 7(i). See Erichs v. Venator Grp., Inc., 128 F. Supp. 2d 1255, 1260 (N.D. Cal. 2001) ("The [c]ourt finds that the two examples [of non-bona fide commission plans] in 29 CFR § 779.416(c) are not exhaustive. As a general matter, the term 'bona fide commission rate' [asks] courts to consider whether the particular payment plan before it comports with Congress' purpose in exempting employers from paying overtime in certain situations . . ."). TBC has provided little information about the contents of the Department of Labor investigation, which, in any event, is not binding on this court. Thus, even if the court were to stray from the majority position and incorporate a

preliminary evaluation of the merits into its analysis, it appears that neither <u>Herrera</u> nor the Department of Labor investigation would disturb the court's finding that plaintiffs have overcome the "fairly lenient" burden at this stage.[8]

### E.  Other Potential Members' Desire to Join Class

TBC also argues that plaintiffs have failed to show evidence that other potential class members desire to opt-in.[9]  Courts are divided on whether plaintiffs are required to make such a showing.  <u>Compare</u> <u>Dybach v. State of Fla. Dep't of Corr.</u>, 942 F.2d 1562, 1567 (11th Cir. 1991) ("[T]he district court should satisfy itself that there are other employees . . . who desire to 'opt-in' . . . ");  <u>Pelczynski</u>, 284 F.R.D. at 368 (requiring plaintiffs to provide evidence that "other similarly situated individuals desire to opt in . . .") (quoting <u>Purdham</u>, 629 F. Supp. 2d at 549);  <u>Parker</u>, 492 F. Supp. 2d at 1164–65 ("[B]efore a conditional-certification motion may be granted, a named plaintiff (or plaintiffs) must proffer some evidence that other similarly situated

---

[8]    Alternatively, TBC argues that, given the <u>Herrera</u> decision and Department of Labor investigation, it would be better to propose a new scheduling order, "fast tracking" the filing of a dispositive motion on the applicability of the § 7(i) exception.  Def.'s Resp. 4–5.  The Eastern District of North Carolina took a similar approach in <u>McLawhorn v. Cnty. of Wayne, N.C.</u>, 2014 WL 5810375, at * 2 (E.D.N.C. Nov. 7, 2014), denying the motion for conditional certification, but allowing for refiling after the court ruled on the defendant's <u>pending</u> motion for summary judgment.  Here, however, TBC has yet to file any dispositive motion and it is not clear how quickly this could be accomplished.  Courts have recognized that "the objectives to be served through a collective action justify the conditional certification of a class of putative plaintiffs early in a proceeding, typically before any significant discovery."  <u>Curtis</u>, 2013 WL 1874848, at *3.  For these reasons, the court declines TBC's request to postpone the conditional certification issue until the resolution of a dispositive motion.

[9]    TBC supplements this argument with an assertion that there are very few potential class members who <u>could</u> join the litigation, due to the fact that "[TBC's] employees started to sign mandatory arbitration agreements in October 2013."  Def.'s Resp. 15.  The court does not find this consideration compelling, as it prematurely assumes that such arbitration agreements are enforceable.  Instead, the court finds that the better approach is to address arbitration issues after conditional certification, when the scope and substance of those issues become clearer.  <u>See</u> <u>Amrhein v. Regency Mgmt. Servs., LLC</u>, 2014 WL 1155356, at *10 (D. Md. Mar. 20, 2014) ("[T]his [c]ourt cannot determine at this stage of the proceeding what potential opt-in plaintiffs, if any, would be subject to valid and binding arbitration.  Thus, the potential for arbitration will not forestall the [p]laintiffs' entitlement to conditional certification."); <u>Davis v. NovaStar Mortgage, Inc.</u>, 408 F. Supp. 2d 811, 818 (W.D. Mo. 2005) (conditionally certifying a class over defendant's contention that "most, if not all, [potential class members] have signed arbitration agreements," and postponing determination of the arbitration issues until after class members had been identified).

individuals desire to opt in to the litigation."); Davis, 303 F. Supp. 2d at 1275 (same as Pelczynski) with Purdham, 629 F. Supp. 2d at 549 (recognizing criticisms of Parker and stating that "[i]t does not appear that any courts within the Fourth Circuit have adopted this relatively stringent test"); Villarreal v. St. Luke's Episcopal Hosp., 751 F. Supp. 2d 902, 916 (S.D. Tex. 2010) ("[T]he court finds that it need not determine whether [p]laintiff has alleged sufficient information that aggrieved individuals are actually willing to opt in to this lawsuit."); Robinson v. Empire Equity Grp., Inc., 2009 WL 4018560, at *2 (D. Md. Nov. 18, 2009) (same as Purdham); Mancia v. Mayflower Textile Servs. Co., 2008 WL 4735344, at *3 n.5 (D. Md. Oct. 14, 2008) (stating that Dybach "does not create an evidentiary standard binding on this court," and criticizing Parker for construing the FLSA too narrowly).

The court in Parker held that it was necessary for plaintiffs to show other potential class members' desire to opt in, because, otherwise, there would be no guarantee others would actually join the lawsuit, and if they did not, no purpose would have been served by certifying the class.[10] Parker, 492 F. Supp. 2d at 1165. Other courts have criticized this position as illogical, since determining whether other plaintiffs wish to join the lawsuit is part of the purpose of certifying the class in the first place. See Helmert v. Butterball, LLC, 2009 WL 5066759, at *5 ("[T]he logic behind defendants' proposed procedure—requiring the plaintiff to show that others want to join in order to send them notice asking if they want to join—escapes the

---

[10]     Notably, the Parker court stated: "It goes without saying that this analysis applies only when there are one or two named plaintiffs. If, for example, eight employees together were to commence an FLSA action, it might be unnecessary to show that others desire to opt in to the litigation, since the sheer number of plaintiffs, standing alone, could render the case 'appropriate' for collective-action status." Parker, 492 F. Supp. 2d 1165 n. 4. The Parker court declined to draw a "precise numerical line" as to when the analysis should apply, and recognized line drawing problems inherent in its rationale. Id. For what it's worth, the number of named plaintiffs in this case, six, is closer to eight than two.

[c]ourt." (quoting Heckler v. DK Funding, LLC, 502 F. Supp. 2d 777, 780 (N.D. Ill. 2007))).  Courts have also determined that this requirement would effectively force plaintiffs to issue informal notices, or otherwise solicit potential class members on their own, undermining the courts' ability to oversee an orderly and accurate notification process.  Id.; see also Hoffman–La Roche, Inc., 493 U.S. at 170 (stating that the benefits of a collective action under § 216(b) "depend on employees receiving accurate and timely notice concerning the pendency of the collective action" and holding that courts have "the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure").

The majority of courts in this circuit have declined to require evidence of other potential plaintiffs' desire to opt-in.[11]  See, e.g., LaFleur,  2012 WL 4739534, at *11 ("Other courts in the Fourth Circuit have addressed this issue and have rejected reading a requirement into the conditional certification standard that dictates consideration of sufficient interest (or lack thereof) of potential opt-in plaintiffs prior to notice to said potential plaintiffs being made.");  Butler v. DirectSAT USA, LLC, 876 F. Supp. 2d 560, 572 (D. Md. 2012) (refusing to impose a requirement that plaintiffs identify other potential opt-in plaintiffs when moving for conditional certification);  Robinson, 2009 WL 4018560, at *2 n.13 ("[D]istrict courts in the Fourth Circuit have declined to adopt "this relatively stringent [requirement].");

---

[11]      Notably, this court was only able to find one decision in this circuit requiring evidence of other potential plaintiffs desire to opt in, Pelczynski, 284 F.R.D. at 368.  Curiously, the Pelczynski court cited Purdham for support, though Purdham declined to impose such a requirement and stated that "[i]t does not appear that any courts within the Fourth Circuit have adopted this relatively stringent test." Purdham, 629 F. Supp. 2d at 549.

Purdham, 629 F. Supp. 2d at 549) (same as Robinson);  Mancia, 2008 WL 4735344,

at *3 n.5 (stating that Dybach "does not create an evidentiary standard binding on this

court," and criticizing Parker for construing the FLSA too narrowly);  Quinteros v.

Sparkle Cleaning, 532 F. Supp. 2d 762, 772, 772 n.5 (D. Md. 2008) (stating that it is

unwilling to "narrowly construe the pleading requirements" to require the requisite

showing that there were in fact opt-in plaintiffs).  Thus, the weight of precedent in

this circuit is decisively against requiring such a showing in order to conditionally

certify a class.  In light of such precedent, as well as the substantive criticism noted

above, the court will not require plaintiffs to demonstrate potential class members'

interest in joining the class.

### F.  Court-Facilitated Notice

In connection with their motion for conditional certification, plaintiffs also ask

the court to: (i) compel TBC to produce a list containing the names, addresses, and

telephone numbers of all potential opt in plaintiffs in the manner in which it regularly

maintained those records, and (ii) to authorize plaintiffs to send their proposed notice,

by mail, to all proposed class members.  Pls.' Br. 9.  TBC initially objected to several

aspects of the proposed notice, Def. Resp. 20–21, but later withdrew all but two

objections at a hearing held September 2, 2015.  At the same hearing, the court ruled

on TBC's remaining objections and approved plaintiffs' proposed notice, subject to a

reduction of the time allowed for plaintiffs' to file class member's consent to become

a party from a date ninety (90) days from the date of notice, to a date sixty (60) days

from the date of notice.

### III.   CONCLUSION

For the foregoing reasons, the court **GRANTS** plaintiffs' motion for conditional certification.  The court **ORDERS** TBC to provide the names, addresses, and telephone numbers of all potential opt-in plaintiffs within five (5) days of the entry of this order, and plaintiff is authorized to mail the approved notice, subject to the change described above, to all potential opt-in plaintiffs.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 30, 2015**
**Charleston, South Carolina**