**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

ANDREW GORDON, TAVIS MCNEIL,    )
DONALD WRIGHTON, NICHOLAS COLE,    )
JACOB GRISSON, AND DAWN DEWEY,    )
*on behalf of themselves and others similarly*    )
*situated*,    )
    )
        Plaintiffs,    )
    )   No. 2:14-cv-03365-DCN
      vs.    )
    )   **ORDER**
TBC RETAIL GROUP, INC. d/b/a TIRE    )
KINGDOM,    )
    )
        Defendant.    )
_____ )

      The following matters are before the court on defendant TBC Retail Group, Inc.'s ("defendant") motion to compel arbitration for plaintiff Nicholas Cole ("Cole"), ECF No. 33[1]; defendant's motion to compel arbitration for all opt-in plaintiffs who signed the mutual arbitration agreement, ECF No. 81; defendant's motion for summary judgment, ECF No. 88; and plaintiffs' motion for joinder of additional parties, ECF No. 92.  For the reasons set forth below, the court denies defendant's motion to compel arbitration for Cole, grants in part and denies in part defendant's motion to compel arbitration for all opt-in plaintiffs who signed the mutual arbitration agreement, grants in part and denies in part defendant's motion for summary judgment, and grants in part and denies in part plaintiffs' motion for joinder of additional parties.

---

[1] Given the amount of briefing addressed in this order, the court cites directly to ECF numbers to avoid confusion.

# I.  BACKGROUND[2]

On August 20, 2014, Cole joined plaintiffs Andrew Gordon, Tavis McNeil, Donald Wrighton, Jacob Grissom, and Dawn Dewey (together with Cole, "plaintiffs") in filing the instant action on behalf of themselves and "all other similarly situated employees."  Compl. at ¶ 2.  Plaintiffs allege that defendant violated the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"), by utilizing a compensation plan that did not provide plaintiffs one and one-half times their regular rate of pay when they worked more than forty hours in a workweek.  Id. at ¶ 23.

Cole was employed by defendant as a mechanic at the Tire Kingdom located at  7201-900 Two Notch Road in Columbia, South Carolina, from approximately May 2013 until April 2014.  Id. ¶ 1.  Between February 2013 and October 2013, defendant drafted and developed a Mutual Agreement to Arbitrate Claims and Waiver of Class/Collective Actions (the "Agreement").  ECF No. 32-2, Filoon Dec. ¶¶ 2–8; ECF No. 81-2, Third Filoon Dec. ¶¶ 2–4.  Defendant finalized the Agreement in October 2013, and began requiring all new hires to sign the Agreement as of October or November 2013.  Filoon Dec. ¶¶ 3, 4.  Between October 2013 and March 2014, defendant made the Agreement available for "electronic signature" through the employee portal—a password protected, computer-based document system.[3]  Id. ¶ 5; see also ECF No. 39-1, Second Filoon Dec. ¶ 9 (describing access and navigation of the employee portal).  In March 2014, defendant circulated a company-wide

---

[2] The following facts are presented in the light most favorable to the plaintiff.
[3] The employee portal also appears to have been used by employees to record their time and the work they performed.  See ECF No. 36-1, Cole Dec. ¶ 6.

communication notifying its employees that the Agreement and a related memorandum (the "Memorandum") were available via the employee portal.  Filoon Dec. ¶¶ 7, 8; ECF No. 33-4, Memorandum 2.

The Memorandum explained that the portal now allowed employees to "review and acknowledge [defendant's] policies, processes, and documents," and that this feature was being implemented with two important documents, one being the Agreement.  Id.  The Memorandum further explained that the Agreement was "a contract" intended "to allow any [employee] to bring any legal claim(s) against [defendant] in a quicker, less formal, and typically less expensive forum than the traditional filing of a lawsuit in court."  Id.  All employees hired before October 15, 2013, were "required to acknowledge" the Agreement no later than Friday March 21, 2014.  Id.

The Agreement provides that, except in certain circumstances not applicable here,

> [A]ny and all disputes, claims, complaints or controversies ("Claims") between you and TBC Corporation and/or any of its parents, subsidiaries, affiliates, agents, officers, directors, employees and/or any of its benefit plans, benefit plan fiduciaries, sponsors or administrators (collectively and individually the "Company"), that in any way arise out of or relate to your employment, the terms and conditions of your employment, your application for employment and/or the termination of your employment will be resolved by binding arbitration and NOT by a court or jury.  As such, the Company and you agree to forever waive and relinquish their right to bring claims against the other in a court of law.

ECF No. 33-3, Arbitration Agreement.  The final page of the Agreement informs the reader as follows:

YOUR SIGNATURE BELOW ATTESTS TO THE FACT THAT:

      1.      YOU HAVE READ, UNDERSTAND, AND AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS.

      2.      YOU ARE SIGNING THIS AGREEMENT VOLUNTARILY.

      3.      YOU ARE NOT RELYING ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY EXCEPT THOSE CONTAINED IN THIS AGREEMENT.

      4.      YOU UNDERSTAND THAT BY SIGNING THIS AGREEMENT, YOU ARE GIVING UP THE RIGHT TO HAVE CLAIMS DECIDED BY A COURT OR JURY.

      5.      YOU HAVE BEEN GIVEN THE OPPORTUNITY TO DISCUSS THIS AGREEMENT WITH PRIVATE LEGAL COUNSEL AT YOUR EXPENSE.

Id. Directly below this language, the Agreement contains signature blocks for both the "Applicant/Employee" and the "Company." Id.

However, employees were not asked to "sign" or "execute" these signature blocks; instead, employees would "acknowledge" the Agreement by entering their employee number and the last four digits of their social security number into a field located on a separate portion of the Agreement's signature page. See Second Filoon Dec. Ex. A, 13–14. This field appeared below a prompt which stated: "I, _____, hereby certify and affirm that I have read the Mutual Agreement to Arbitrate. Please enter your Employee Number and last four digits of your Social Security Number as your electronic signature." Id. Defendant has produced records indicating that numerous opt-in plaintiffs,[4] as well as Cole, electronically "acknowledged" the Agreement in this manner. See Third Filoon Dec. ¶ 12; ECF Nos. 33-2, 33-3, Attachments to Third Filoon Dec. (collecting signature pages, confirmation screen

---

[4] Defendant has produced such evidence with respect to both opt-in plaintiffs who filed a consent form before the scheduled deadline, see Third Filoon Dec. ¶ 12, and opt-in plaintiffs who filed late consent forms, see ECF No. 88-2, Fourth Filoon Dec. Ex. 1 (providing summary chart).

shots, and summary charts of employees who filled out acknowledgment field); ECF

No. 33-5 (confirmation screenshot of Cole's acknowledgment, dated March 24,

2014). Cole, for his part, claims that he "does not recall" ever doing so. Cole Dec. ¶

3.

Only then-current employees accessed the Agreement through the employee

portal. The process was significantly different for new hires and rehires. These

employees "signed" the Agreement through an "electronic onboarding process"

known as the "Kronos System." Fifth Filoon Dec. ¶ 3. This system required newly

hired or rehired employees to log in using their name and portions of their social

security number. Id. The employees then agreed to a block of text labeled "e-

Signature Acceptance," which stated that the employee agreed to "use the electronic

click as [his or her] 'written' signature." Id. Attach. 22. The employee was then

required to view a series of documents, including the Agreement, and "sign" each

document by "clicking" an icon labeled "Sign." Id. After the employee provided

this electronic signature, a message appeared saying that the document was now

"signed," and giving the date and time of the signature. Id. ¶ 4. Employees could not

complete the hiring process without "signing" each document.[5] Id.

On September 30, 2015, the court granted plaintiffs' motion for conditional

class certification. ECF No. 40. As part of that order, the court ordered defendant to

provide the names, address, and telephone numbers of all potential opt-in plaintiffs,

---

[5] The conflicting verbiage used in the employee portal and Kronos System is a
potential source of confusion when discussing these motions. Therefore, the court
will use quotation marks only when referring specifically to the act of either
"acknowledging" the Agreement through the employee portal or "signing" the
Agreement through the Kronos System. When referencing the concept signatures or
the act of signing a document, generally, quotation marks will be omitted.

and authorized plaintiffs to mail a court-approved notice to all potential opt-in

plaintiffs.  Id. at 23.  The court specifically required plaintiffs to amend the proposed

notice to provide putative class members "sixty (60) days from the date of the notice"

to file a consent to join the action (a "consent form").  Id. at 22.  On November 12,

2015, plaintiffs filed their Notice of Mailing, indicating the approved notice was

mailed to 2,733 putative plaintiffs.  ECF No. 42.  This gave plaintiffs until January

11, 2016 to file any putative class members' consent forms.

        During this opt-in period, plaintiffs filed around 570 consent forms.  ECF

Nos. 43–73.  Notably, only one named plaintiff, Tavis McNeil ("McNeil"), filed a

formal consent form.  ECF No. 65.  Following the conclusion of the scheduled opt-in

period, plaintiffs filed 34 additional consent forms.  ECF Nos. 73–79.  Over the

course of the opt-in process, plaintiffs also filed a number of consent forms presenting

a variety of unique issues.  Specifically, defendant has identified five opt-in plaintiffs

who were mistakenly included on the opt-in list, four opt-in plaintiffs defendant has

not been able to identify, three John Doe opt-in plaintiffs, and two consent forms that

appear to have been filed by a single opt-in plaintiff.  Defendant has also identified

those opt-in plaintiffs whose consents were filed either two or three years after their

final paycheck for work as a Tire Kingdom mechanic under the "turned hour"

compensation plan.  Fourth Filoon Dec. ¶ 4.

        Defendant filed a motion to compel arbitration against Cole on August 3,

2015, well before the opt-in period began.  Plaintiffs filed a response to this motion

on August 26, 2015, and defendant filed its reply in support on September 8, 2015.

On March 7, 2016, defendant filed a second motion to compel arbitration against all

opt-in plaintiffs who signed the Agreement and asked the court to stay a scheduled

hearing on its first motion to compel arbitration, until both matters could be heard

together.  Defendant then filed a motion for summary judgment on April 22, 2016.

Plaintiffs responded to the second motion to compel arbitration on April 29, 2016.

Plaintiffs then filed a motion for the joinder of additional parties on May 6, 2016.  On

May 9, 2016, defendant filed its reply in support of its second motion to compel

arbitration, and on May 20, 2016, defendant filed a response to plaintiffs' motion for

joinder of parties.  On May 23, 2016, plaintiffs filed a response in opposition to

defendant's motion for summary judgment, and on May 31, 2016, plaintiffs filed a

reply in support of their motion for joinder.  Finally, on June 3, 2016, defendant filed

a reply in support of its motion for summary judgment.  The court held a hearing on

June 24, 2016, and the motions are now ripe for the court's review.

## II.  STANDARDS

### A.    Motion to Compel Arbitration

Defendant moves to compel arbitration under Section 4 of the Federal

Arbitration Act ("FAA"), which provides in part that a "party aggrieved by the

alleged failure, neglect, or refusal of another to arbitrate under a written agreement

for arbitration may petition any United States district court . . . for an order directing

that such arbitration proceed in the manner provided for in such agreement."  9

U.S.C. § 4.  Section 2 of the FAA states that a written arbitration agreement "shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in

equity for the revocation of any contract."  9 U.S.C. § 2.  "[Q]uestions of arbitrability

must be addressed with a healthy regard for the federal policy favoring arbitration . . .

[and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." <u>Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.</u>, 460 U.S. 1, 23–24 (1983). Although federal law governs the arbitrability of disputes, ordinary state-law principles resolve issues regarding the formation of contracts. <u>Am. Gen. Life & Accident Ins. Co. v. Wood</u>, 429 F.3d 83, 87 (4th Cir. 2005).

"Motions to compel arbitration in which the parties dispute the validity of the arbitration agreement are treated as motions for summary judgment." <u>Rose v. New Day Fin., LLC</u>, 816 F. Supp. 2d 245, 251 (D. Md. 2011). "Accordingly, arbitration should be compelled where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Erichsen v. RBC Capital Markets, LLC</u>, 883 F. Supp. 2d 562, 566–67 (E.D.N.C. 2012) (quoting Fed. R. Civ. P. 56). A trial is necessary if the material facts regarding the making of an agreement to arbitrate are in dispute. <u>Avedon Engineering, Inc. v. Seatex</u>, 126 F.3d 1279, 1283 (10th Cir. 1997).

**B.    Motion for Summary Judgment**

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Anderson, 477 U.S. at 255.

### C.      Motion for Joinder of Additional Parties

Under the FLSA, plaintiffs may institute a collective action against their employer on behalf of themselves and other similarly situated employees. Section 216(b) of the FLSA states,

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).  The mechanism outlined in § 216(b) is designed to facilitate the efficient adjudication of similar claims by "similarly situated" employees by permitting the consolidation of individual claims and the pooling of resources in prosecuting such actions against their employers.  See Hoffmann–La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989); LaFleur v. Dollar Tree Stores, Inc., 2014 WL 934379, at *2 (E.D. Va. Mar. 7, 2014); Lynch v. United Servs. Auto. Ass'n, 491 F. Supp. 2d 357, 367 (S.D.N.Y. 2007).  While § 256(b) outlines the procedures for putative plaintiffs to join a collective action, it does not specify when the putative plaintiffs must opt-in to the action.  Regan v. City of Charleston, S.C., No. 2:13-cv-3046, 2015 WL 1299967, at *2 (D.S.C. Mar. 23, 2015).  Rather, opt-in deadlines are set by the district court.  Id.  The FLSA also does not explicitly set forth or otherwise indicate the standard under which a trial court should consider whether putative plaintiffs may join a collective action beyond the specified deadline.  Ruggles v. Wellpoint, Inc., 687 F. Supp. 2d 30, 37 (N.D.N.Y. 2009).  However, courts within this district have weighed the following factors:   "(1) whether 'good cause' exists for the late submissions; (2) prejudice to the defendant; (3) how long after the deadline passed the consent forms were filed; (4) judicial economy; and (5) the remedial purposes of the FLSA."  Regan, 2015 WL 1299967, at *2 (citing Ruggles, 687 F. Supp. 2d at 37).

### III.   DISCUSSION

The motions addressed in this order each relate, in one way or another, to the requirements for class membership.  Despite this general theme, the motions deal with a variety of legal issues and different sets of facts.  Defendant's motions to

compel can be analyzed together, as they rely on the same Agreement. Defendant's motion for summary judgment asks the court to settle four distinct questions: (1) whether the named plaintiffs were required to file consent forms to join this action; (2) whether any plaintiffs who failed to file consent forms within the 60 day opt-in period may be included in this action; (3) whether a two- or three-year statute of limitations applies to plaintiffs' claims; and (4) whether the various opt-in plaintiffs who were inadvertently included on the putative plaintiff list, or cannot be identified, may be included in this action. Plaintiffs' motion for joinder of additional parties overlaps with the second issue presented by defendant's motion for summary judgment. The court first addresses defendant's motions to compel arbitration and then analyzes each issue presented by the motion for summary judgment in turn. To the extent defendant's motion for summary judgment overlaps with plaintiff's motion for joinder of additional parties, the issues will be analyzed together.

### A.     Motions to Compel Arbitration

Defendant argues that Cole and all opt-in plaintiffs who signed the Agreement (the "arbitration plaintiffs") must be compelled to arbitrate such claims based on the terms of the Agreement. ECF No. 91-1 at 8–13. Plaintiffs contend that the arbitration plaintiffs never actually entered into the Agreement and, therefore, are not bound by its terms.[6] ECF No. 36 at 3–4; ECF No. 89 at 7–12.

---

[6] Plaintiffs also argue that the Agreement is unenforceable because it purports to bind nonparties to the Agreement. ECF No. 89 at 3–7. The challenged language reads as follows: "To the maximum extent permitted by law, the parties agree that this Agreement is binding on any person who represents or seeks to represent you or the Company in a lawsuit against the other in a court of law." Id. at 3. Plaintiffs go on to offer a somewhat tenuous explanation for why this language should be read to

Defendant, as the party seeking to enforce the Agreement, bears the initial burden of "persuading this court that the parties entered into an enforceable arbitration agreement."  Drake v. Mallard Creek Polymers, Inc., 2014 WL 7405762, at *1 (W.D.N.C. Dec. 30, 2014).  If defendant makes such a showing, then "the burden shifts to the plaintiff[s] to show that even though there was some written contract, [they] did not actually agree to it-because the[ir] signature was forged, the terms of the contract were misrepresented, or some other reason evincing lack of true agreement."  Czopek v. TBC Retail Grp., Inc., 2014 WL 5782794, at *4 (M.D. Fla. Nov. 6, 2014); see also U.S. ex rel. TBI Investments, Inc. v. BrooAlexa, LLC, 119 F. Supp. 3d 512 (S.D.W. Va. 2015) (applying summary judgment standard to motion to compel arbitration and stating that "[o]nce the moving party has met its burden, the burden shifts to the nonmoving party to demonstrate that a genuine issue of material

---

preclude nonparties to the Agreement from maintaining their own claims against the defendant.

There are a number of deficiencies in this argument.  First, the phrase "to the maximum extent permitted by law" indicates the Agreement does not extend to claims between defendant and non-parties to the Agreement because the law would not permit such an application.  See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945 (1995) ("[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration.").  Moreover, the sentences following this language clarify that it is "the parties" who "agree that no [c]laims may be initiated [on a class, collective, or representative action basis]" and that "[a]ny [c]laims must be brought in a party's individual capacity."  Agreement 2 (emphasis added).  This language indicates that the parties to the Agreement intended the Agreement to govern their own claims, not those of others.  Plaintiff notes that the Agreement defines "claims" in general terms, and does not set forth a definition for the singular "party"—despite the fact that the Agreement quite clearly defines the plural "parties" as the parties to the Agreement.  ECF No. 89 at 5–6.  Regardless of these observations, the court fails to see how the Agreement could reasonably be read to create any ambiguity as to the parties' intent.  Finally, defendant is not seeking to apply the Agreement to any nonparties.

Therefore, the court finds that the Agreement is enforceable against those employees who agreed to its terms.

fact exists for trial."). "When deciding whether the parties agreed to arbitrate a certain matter[,] courts [] should apply ordinary state-law principles that govern the formation of contracts." First Options, 514 U.S. at 944.

Here, there is no question that the language of the Agreement would obligate the arbitration plaintiffs to submit their claims to arbitration. See Agreement 2 ("[A]ny and all disputes, claims, complaints or controversies [] between you and [defendant] . . . that in any way arise out of or relate to your employment . . . will be resolved by binding arbitration NOT by a court or jury."). The true question is whether the arbitration plaintiffs actually entered into the Agreement. Defendant has produced printouts relating to each arbitration plaintiff, showing either (1) a screenshot of a confirmation page indicating the plaintiff "acknowledged" the Agreement via the employee portal, or (2) a typed name in the Agreement's signature block indicating the plaintiff "signed" the Agreement via the Kronos System. Compare Third Filoon Dec. Attachment 103 (confirmation screenshot of opt-in plaintiff Hector Miranda); with Third Filoon Dec. Attachment 104 (electronic signature page of opt-in plaintiff Steven Lizarraga).

### 1.     Prima Facie Showing

Plaintiffs first argue that this evidence is insufficient to meet defendant's initial burden because defendant has failed to authenticate these purported "signatures" and "acknowledgments." ECF No. 89 at 8. In response, defendant highlights evidence that the employee portal was password secured, and the Agreement's electronic "acknowledgment" required employees to enter their

employee number and a portion of their social security number.  Second Filoon Dec.
¶ 9, Ex. A.

"To establish that evidence is authentic, a proponent need only present
'evidence sufficient to support a finding that the matter in question is what the
proponent claims.'" United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009)
(quoting Fed. R. Evid. 901(a)).  "[T]he burden to authenticate under Rule 901 is not
high—only a prima facie showing is required," and a "district court's role is to serve
as gatekeeper in assessing whether the proponent has offered a satisfactory
foundation from which the jury could reasonably find that the evidence is authentic."
Id.  "A signature demonstrates that the signer intends to authenticate a document as
her own act through the use of a mark."  Hamdi Halal Mkt. LLC v. United States, 947
F. Supp. 2d 159, 164 (D. Mass. 2013).  The arbitration plaintiffs all worked in states
that have adopted the Uniform Electronic Transactions Act ("UETA").  See Florida
Statues § 668.001, et seq.; O.C.G.A. § 10-12-1, et seq. (Georgia); LA Rev. Stat.
§ 9:2601, et seq. (Louisiana); MS Code § 75-12-1, et seq. (2015) (Mississippi); N.C.
Gen. Stat. § 66-311, et seq.; S.C. Code Ann. § 26-6-10, et seq.; 9 VSA § 270, et seq.
(Vermont).  South Carolina's version of the UETA provides the following:

> An electronic record or electronic signature is attributable to a person
> if it is the act of the person.  The act of the person may be shown in
> any manner, including a showing of the efficacy of a security
> procedure applied to determine the person to which the electronic
> record or electronic signature was attributable.

S.C. Code Ann. § 26-6-90.

Some courts "have found the declaration of the human resource employees
sufficient to authenticate electronic signatures."  Tagliabue v. J.C. Penney Corp., Inc.,
2015 WL 8780577, at *2 (E.D. Cal. Dec. 15, 2015) (collecting cases).  Other courts

have focused on the factual circumstances surrounding the purported signature.  See

Jones v. U-Haul Co. of Mass. & Ohio Inc., 16 F. Supp. 3d 922, 934 (S.D. Ohio 2014)

(assessing security measures used to protect defendants' online system and finding

employee's claim that her signature was not authentic failed to create a genuine issue

of material fact); Kerr v. Dillard Store Servs., Inc., 2009 WL 385863, at *5 (D. Kan.

Feb. 17, 2009) ("While the record establishes that Champlin and plaintiff were at the

kiosk on April 28, it does not show that they were there at precisely 3:26:20 p.m.

Therefore, it is not inconceivable Champlin or a supervisor logged on to plaintiff's

account and executed the agreement.").

Under either approach, defendants have satisfied their burden to authenticate

the proffered screenshots and signature pages.  Defendant's Vice President of Human

Resources, Megan Filoon, has submitted numerous declarations attesting to the

records' authenticity.  See Third Filoon Dec. ¶ 11; ECF No. 94-1, Fifth Filoon Dec.

¶ 4.  Filoon's declarations also outlined the processes both current and new

employees used to access the Agreement.  Second Filoon Dec. ¶ 9, Ex. A (detailing

process for current employees to access Agreement on portal); Fifth Filoon Dec. ¶ 4,

Attachment 22 (detailing process for new hires to sign Agreement).  Both processes

required employees to enter personal information to access the Agreement and then

take some specific action to either "acknowledge" or "sign" the Agreement.  These

measures are similar to those used by the defendants in Jones, which the Southern

District of Ohio found sufficient to establish the authenticity of the plaintiff's

electronic signature.  See Jones, 16 F. Supp. 3d at 934 (describing security steps,

including "a requirement that employees enter their social security number, or their

15

'System Member Identification Number and a confidential, self-selected password' to access the online system" and stating that "[e]mployees then needed to input their names into the system to verify their signatures"). In light of these security measures and the supporting declarations of Megan Filoon, the court finds defendant has made a threshold showing that the screenshots and signature pages are authentic.

### 2.     Plaintiff's Evidence of Forgery

Despite defendant's threshold showing of authenticity, Cole and a number of the opt-in plaintiffs maintain that that they "do not recall" one, or all, of the following: (1) "acknowledging" or "signing" the Agreement, (2) receiving a copy of the Agreement or the Memorandum, or (3) ever seeing either document posted in the store. Cole Dec. ¶¶ 3–5, 7; ECF Nos. 89-1–89-5, 89-7, 89-9–89-11 (declarations of opt-in plaintiffs Jeffrey Anderson, Johnathan Atkins, Richard "Dean" Berger, Duston Everett, Mark Leiberick, Kyle Petitt, Heather Sheridan, and George Whitner). However,

> a witness who states that he cannot remember whether or not an event alleged to have happened by the moving party actually took place does not help the nonmoving party to meet its burden. The nonmoving party must come up with evidence that negates the version of events alleged by the moving party—an acknowledgment that the event may have occurred, but the witness cannot remember, falls short.

Cox v. United States, 2015 WL 1040577, at *3 (M.D.N.C. Mar. 10, 2015) (quoting Chandler v. James, 985 F. Supp. 1094, 1100 (M.D. Ala. 1997)). Thus, a signatory's inability to remember signing an agreement, or other surrounding facts, is insufficient to create a genuine dispute of fact as to the authenticity of the signature.

This is not to say that the opt-in plaintiffs have no means of advancing their argument. Certain opt-in plaintiffs claim more than simple forgetfulness. Opt-in

plaintiffs "Jeff" Forest Hatcher, Jr. and Ray McCall flatly deny having signed the Agreement and state that someone else <u>must</u> have signed it for them.  ECF Nos. 89-6, 89-8.  Courts have found that plaintiffs' allegations of forgery are sufficient to create a genuine dispute of fact regarding the signature's authenticity when made in a sworn affidavit or testimony.  <u>See</u> <u>Schoendorf v. Toyota of Orlando</u>, 2009 WL 1075991, at *7 (M.D. Fla. Apr. 21, 2009) (crediting plaintiff's testimony that she did not sign arbitration agreement over inconclusive evidence that signature was hers); <u>Brooks v. Robert Larson Auto. Grp., Inc.</u>, 2009 WL 2853452, at *4 (W.D. Wash. Sept. 1, 2009) (finding genuine issue of fact based on "[p]laintiff's signed declaration, under penalty of perjury, stating that she did not sign the arbitration agreement, that it does not contain her signature, and that she believes her purported signature is fraudulent and her initials fabricated"); <u>Chambers v. Sun W. Mortgage, Co.</u>, 2014 WL 2211015, at *5 (S.D. Ohio May 28, 2014), <u>report and recommendation adopted</u>, 2014 WL 2873976 (S.D. Ohio June 24, 2014) (finding allegations of forgery insufficient where "plaintiff ha[d] not presented any affidavits or other probative evidence to substantiate her allegations").   Other plaintiffs do not go quite as far as Hatcher and McCall, but do claim their supervisors often filled out electronic forms for them.  <u>See</u> ECF Nos. 89-3–89-8, 89-10, 89-11 (declarations of Richard Berger, Duston Everett, "Jeff" Forest Hatcher, Jr., Mark Leiberick, Heather Sheridan, and George Whitner). Viewing the evidence in the light most favorable to plaintiffs, the court finds this evidence sufficient to create a genuine dispute of fact as to whether it was the opt-in plaintiffs or their manager who signed the Agreement.

Therefore, opt-in plaintiffs Richard Berger, Duston Everett, "Jeff" Forest Hatcher, Jr., Mark Leiberick, Ray McCall, Heather Sheridan, and George Whitner cannot be compelled to arbitrate their claims at this time.

### 3.     Plaintiffs' Lack of Assent

The arbitration plaintiffs also contend that even if they did electronically "acknowledge" or "sign" the Agreement, that does not mean they agreed to be bound by the Agreement's terms because the Memorandum, the Agreement, and the process used to obtain their electronic signatures did not make it clear that such signatures were meant to show their assent to the Agreement. ECF No. 26 at 4–7; ECF No. 89 at 9–12. Plaintiffs especially take issue with defendant's repeated use of the word "acknowledge," rather than "execute," throughout the Memorandum and the employee portal. ECF No. 26 at 4–7,

In each of the states where the arbitration plaintiffs worked, the formation of a contract requires "a meeting of the minds of the contracting parties in regard to the essential terms." See, e.g., Fulmer v. London, Liverpool & Globe Fire Ins. Co., 174 S.E. 466, 467 (S.C. 1934).[7] "When a contract is unambiguous, clear, and explicit, it

---

[7] See also Acosta v. Dist. Bd. of Tr. of Miami-Dade Cmty. Coll., 905 So. 2d 226, 228 (Fla. Dist. Ct. App. 2005) ("The rule is generally recognized that for the parties to have a contract, there must be reciprocal assent to certain and definite propositions." (quoting Truly Nolen, Inc. v. Atlas Moving & Storage Warehouses, Inc., 125 So. 2d 903, 905 (Fla. Dist. Ct. App. 1961)); Bert Allen Toyota, Inc. v. Grasz, 909 So. 2d 763, 767 (Miss. Ct. App. 2005) (requiring "that there was a meeting of the minds as to all essential elements of the contract."); TranSouth Fin. Corp. v. Rooks, 604 S.E.2d 562, 564 (Ga. Ct. App. 2004) ("Unless and until there is a meeting of the minds as to all essential terms, a contract is not complete and enforceable."); Starr Farm Beach Campowners Ass'n, Inc. v. Boylan, 811 A.2d 155, 158 (Vt. 2002) ("An enforceable contract must demonstrate a meeting of the minds of the parties: an offer by one of them and an acceptance of such offer by the other."); N-Y Assocs., Inc. Nicoladis v. St. Charles Par. Police Jury Melancon, 422 So. 2d 520,

must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary, and popular sense." <u>Sifonios v. Town of Surfside Beach</u>, 777 S.E.2d 425, 428 (S.C. Ct. App. 2015) (quoting <u>S.C. Dep't of Transp. v. M & T Enterps. of Mt. Pleasant, LLC</u>, 667 S.E.2d 7, 13 (S.C. Ct. App. 2008)). "If a contract is ambiguous, parol evidence is admissible to ascertain the true meaning of the contract and the intent of the parties." <u>Plantation A.D., LLC v. Gerald Builders of Conway, Inc.</u>, 687 S.E.2d 714, 718 (S.C. Ct. App. 2009). The court must "construe any doubts and ambiguities [] against the drafter of the agreement." <u>Mathis v. Brown & Brown of S.C., Inc.</u>, 698 S.E.2d 773, 778 (S.C. 2010); <u>Moody v. McLellan</u>, 367 S.E.2d 449, 451 (S.C. Ct. App. 1988) ("Since the language of the instrument is the employer's, the court must construe it, if its meaning is ambiguous, against the drafter.").

The word "acknowledge" can be used in a number of ways. <u>See</u> Acknowledge, Black's Law Dictionary (10th ed. 2014). It can be used "to show that one accepts responsibility for" something. <u>Id.</u> In this sense, the word could be understood to signify assent to an agreement. Alternatively, "acknowledge" can be used to "make known the receipt of" or to signify a one's recognition that a document is valid or genuine. <u>Id.</u>

The first interpretation, as a signal of acceptance of responsibility, could certainly be used in this case. The language of the Agreement is clearly contractual. The final page explicitly informs employees that their signatures attest to the fact that

---

522 (La. Ct. App. 1982) ("The minds of the contracting parties must have met, as regards the substantial elements of the contract, as a condition precedent to its validity.").

they "agree to be legally bound to all of the above terms" and that they "are giving up their right to have claims decided by a court or jury." <u>See</u> Second Filoon Dec. Ex. A at 13.

However, the arbitration plaintiffs did not physically sign the signature block on the document. <u>Id.</u> Instead, the Agreement provided an electronic signature through either the employee portal or the Kronos System. Those arbitration plaintiffs who were already existing employees utilized the employee portal, which requested an electronic signature under a separate prompt at the bottom of the final page of the Agreement, pursuant to which each employee "certif[ied] and affirm[ed] that [he or she] read the [Agreement]." <u>Id.</u> This electronic signature was created by clicking an icon which read "Acknowledge." <u>Id.</u> On the face of this language alone, an employee might reasonably have thought that he was simply being asked to confirm that he had received and read the Agreement. This interpretation is consistent with the alternative use of the word "acknowledge," meaning to "make known the receipt of." <u>Acknowledge</u>, BLACK'S LAW DICTIONARY (10th ed. 2014). Thus, the language of the Agreement, when viewed through the employee portal, is ambiguous.[8]

---

[8] Notably, plaintiffs do not address the Kronos System for newly hired or rehired employees. As described more fully above, the Kronos System was significantly less ambiguous. The court recognizes that it was not without its faults. It still required employees to "sign" the Agreement almost immediately after reading it, despite the language on the signature page indicating that the "[employee] ha[s] been given the opportunity to discuss this Agreement with private legal counsel." Agreement 5. Nevertheless, the Kronos System's repeated use of the word "sign"— as opposed to "acknowledge"—and its explicit explanation of the consequences of using the "click" e-signature, made it clear that the "click" was meant to bind the employee to the terms of the Agreement. Given these facts and plaintiffs' failure to address the issue, the court finds that there is no ambiguity in the Kronos System sufficient to relieve arbitration plaintiffs of the obligations imposed by the Agreement.

Looking beyond the Agreement to parol evidence does not resolve this ambiguity. The Memorandum offers little that could not be gleaned from the Agreement itself. <u>See</u> TBC Memorandum to Associates 2–3. It simply indicates that the Agreement was a contract and the employees were required to "acknowledge" it. <u>Id.</u> If anything, the Memorandum adds to the confusion. To the extent the Memorandum can be read to instruct employees to acknowledge the Agreement immediately after reading it, <u>see id.</u> at 3 (instructing to employee to acknowledge the Agreement after reviewing it), it conflicts with language on the Agreement's signature page indicating that the employee had an opportunity to consult an attorney before "signing." <u>See</u> Second Filoon Dec. Ex. A at 13. One plausible way to reconcile this conflict is to recognize a distinction between "acknowledging" and "signing" the Agreement. Certainly, the arbitration plaintiffs must have understood that defendant wanted them to enter into the Agreement at some point, but the Memorandum and Agreement simply do not make it clear that this was to be accomplished through the "acknowledgment."

Defendant relies on <u>Czopek</u>, 2014 WL 5782794, at *3, to argue that the use of the word "acknowledge" is unambiguous. In <u>Czopeck</u>, the Middle District of Florida was faced with a motion to compel arbitration pursuant to the same Agreement at issue here. <u>See id.</u> at *1 (describing agreement's language and implementation process). The <u>Czopeck</u> court did enforce the Agreement, but not because it found the "acknowledgment" language unambiguous. Instead, the <u>Czopeck</u> court found that the plaintiffs accepted the Agreement by continuing their employment after being made aware that their continued employment was conditioned upon acceptance of the

Agreement.  Id. at *4 (explaining that plaintiffs continued employment constituted acceptance of the agreement).  The court did not discuss the significance of the word "acknowledgement."[9]  Id.

To the extent the Czopeck decision rests on an assumption that an employee's "acknowledgment" was enough to establish their assent to the Agreement, the case is distinguishable, because there was specific evidence that both of the Czopeck plaintiffs held that understanding.  See id. at *3.  One plaintiff attended a meeting in which his store manager explained the Agreement, and later filed a declaration pointing out that he could not read the contents of the Agreement when he provided his "acknowledgment," suggesting he understood the effect of that action.  Id. Another employee initially refused to electronically "acknowledge" the Agreement because of the attestation on the final page indicating that the Agreement was signed "voluntarily," suggesting he equated his "acknowledgment" to a signature in the signature block incorporated into the Agreement.  Id.

In this case, there is conflicting evidence on the arbitration plaintiffs' understanding of the Agreement.  While defendant contends that it produced a company-wide communication notifying employees of the Memorandum and Agreement, and directed store managers to post the notification in a prominent location, see Filoon Dec. ¶ 8; Second Filoon Dec. ¶ 8, defendant has not shown what information this notification contained.  Moreover, a number of arbitration plaintiffs have proffered affidavits stating that their managers never discussed the Agreement

_____

[9] While defendant notes that plaintiffs failed to cite any legal authority for their argument that the Agreement was ambiguous, Def.'s Reply 5, it is notable that the only decision defendant cites in response does not address the issue.

or Memorandum with them.  Cole Dec. ¶ 5; ECF Nos. 89-1–89-11 (declarations of various opt-in plaintiffs).  Given the ambiguities in the actual Agreement, the Memorandum, and the employee portal signature process, as well as the absence of external evidence clarifying the employees' intent, the court finds a genuine issue of material fact exists as to whether those employees who "acknowledged" the Agreement through the employee portal intended to be bound by its terms.

Any attempt to argue that Cole accepted the terms of the Agreement by continuing his employment also fails.  It is generally recognized that continued employment can constitute acceptance of a contract, when such employment is conditioned on acceptance of the contract.  See, e.g., Towles v. United HealthCare Corp., 524 S.E.2d 839, 845 (S.C. Ct. App. 1999); Czopek, 2014 WL 5782794, at *4 ("Under Florida law, continued employment can constitute acceptance of a contractual offer."); Caley v. Gulfstream Aerospace Corp., 333 F. Supp. 2d 1367, 1375 (N.D. Ga. 2004), aff'd, 428 F.3d 1359 (11th Cir. 2005) ("As a matter of law, then, Defendants' offer was open to acceptance through Plaintiffs' continuation of employment.").  Indeed, the Agreement makes it quite clear that each employee's continued employment was conditioned on their assent to the terms of the Agreement.  See Agreement 2 ("As a condition of my employment and/or continued employment . . . []Employee [] and the Company [] agree . . . .").  Nevertheless, in certain circumstances—notably, plaintiff Cole's—the arbitration plaintiff might have reasonably believed that their acceptance had not yet become a condition of employment.  Though the Memorandum indicated that employees were required to "acknowledge" the Agreement by March 21, 2014, see TBC Memorandum to

Associates 2, this leads to the same uncertainty over the word "acknowledge" discussed above.[10]  Moreover, the Agreement suggests employees were entitled to some grace period between reading and accepting the Agreement, since each signatory attests that they were given an opportunity to seek legal counsel. Agreement 5.  Cole's employment with defendant ended sometime in April 2014, at most, a month after he "acknowledged" the Agreement on March 24, 2014.[11]  ECF No. 33-5.  For the same reasons Cole could have reasonably believed that he had some time to consider the Agreement before accepting its terms, he could have reasonably believed that this grace period had not yet expired at the time he resigned in April 2014.

Plaintiffs request that the court hold an evidentiary hearing on the issue of the Agreement's formation after allowing for limited, issue-specific discovery.  ECF No. 36 at 7–8.  "The FAA provides for discovery and a full trial in connection with a motion to compel arbitration only if 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue.'" Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 726 (9th Cir. 1999) (quoting 9 U.S.C. § 4).  For the reasons set forth above, the making of the Agreement appears to be in dispute for two very specific subsets of the arbitration plaintiffs:  (1) those who electronically signed the

---

[10] It is not entirely clear that Cole read the Memorandum containing that deadline, since he claims he was never notified that it existed.  Cole Dec. ¶¶ 4–6. Because defendant has produced evidence that it provided employees with some notice of the Memorandum and Cole has simply stated that he "does not recall" seeing that notice, see Filoon Dec. ¶ 7–8; Cole Dec. ¶ 5, the court will assume, for the purpose of this discussion, he did see the notice and read the Memorandum.

[11] While plaintiffs' complaint simply indicates that Cole's employment ended in April 2014, Compl. ¶ 8, defendant has provided evidence that he resigned on April 23, 2014.  Second Filoon Dec. ¶ 11.

Agreement through the employee portal, rather than the Kronos system, and left their employment with defendant shortly thereafter[12]; and (2) those who have submitted sworn affidavits claiming that their supervisors frequently accessed their employee portals and completed required tasks "for them."

The court grants plaintiffs' request for an evidentiary hearing, in accordance with 9 U.S.C. § 4, for these limited subsets of arbitration plaintiffs.[13]

### B.    Motion for Summary Judgment and Motion to Join Parties

Defendant's motion for summary judgment sets forth various challenges to the named plaintiffs', and various opt-in plaintiffs', participation in this action. Defendant argues the following: (1) the named plaintiffs—except McNeil—failed to file the consent forms necessary to join this action; (2) all named and opt-in plaintiffs who failed to file consents within the 60-day opt-in period must be excluded from this action; (3) a two-year statute of limitations applies to plaintiffs' claims and, therefore, any plaintiff whose claim arose over two years before the filing of their consent form must be excluded from this action; and (4) the various opt-in plaintiffs who were inadvertently included on the putative plaintiff list or cannot be identified must be

---

[12] The court declines to provide any definite rule for how long an employee could have remained employed by defendant while still reasonably believing that the Agreement's terms had not yet become conditions of their employment. That being said, the court notes that it is customary for employees to give notice two weeks before ending an employment relationship. Given this practice, the court has serious doubts that an employee could have reasonably believed they were not bound by the terms of the Agreement if they were still employed by defendant more than a month after "acknowledging" the Agreement.

[13] Though plaintiffs request an "evidentiary hearing," Section 4 of the FAA speaks in terms of a "summary trial." 9 U.S.C. § 4. Section 4 allows the party disputing arbitration to demand a jury trial, which plaintiffs have not done. Id. Therefore, the court takes their request for an "evidentiary hearing" to be a request for a summary trial conducted by the court. Id. ("If no jury trial be demanded by the party alleged to be in default, . . . the court shall hear and determine such issue.").

excluded from this action.  Notably, the second issue listed above overlaps with plaintiffs' motion to join additional parties.  The court addresses each issue in turn.

### 1.     Named Plaintiffs' Failure to File Consent Forms

Apart from McNeil, none of the named plaintiffs in this action filed a formal consent form to participate in this action.  Defendant contends that all plaintiffs, including named plaintiffs, are required to file consents to participate in a collective action and, therefore, all named plaintiffs who failed to do so should be dismissed.  ECF No. 88-1 at 8–9.  Plaintiffs offer two arguments in response.  First, plaintiffs contend that because they filed this action in both their individual and collective capacities, they are not required to file consents to maintain the individual claims.  Alternatively, plaintiffs argue that the declarations filed in support of their motion for conditional certification count as valid "consents" under Section 16(b) of the FLSA.

Section 16(b) of the FLSA provides the following:

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).  Section 7 of the Portal-to-Portal Act of 1847, 29 U.S.C. § 256, further provides that:

> [A]n action commenced . . . under the [FLSA] . . . , shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the [FLSA] . . . , it shall be considered to be commenced in the case of any individual claimant--
>
> **(a)** on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or

**(b)** if such written consent was not so filed or if his name did not so appear--on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256.  The Fourth Circuit has observed that, at least for statute of limitations purposes, this language requires both named and opt-in plaintiffs to file consents.  In re Food Lion, Inc., 151 F.3d 1029, 1988 WL 322652, at *12 (4th Cir. 1998) ("Until a plaintiff, even a named plaintiff, has filed a written consent, [ ]he has not joined in the class action, at least for statute of limitations purposes." (unpublished table decision) (quoting SonguMbriwa v. Davis Memorial Goodwill Indus., 144 F.R.D. 1, 2 (D.D.C. 1992))).  The Food Lion court applied this rule to uphold the dismissal of "six named plaintiffs who failed to file timely consents."  Id. at *13.  The court explained as follows:

> Had [the] action been brought simply as an individual case with several plaintiffs, there would have been no need for any consents to have been filed. The filing of a collective action under 29 U.S.C. § 216(b), however, renders consents necessary, and these claims below were brought in just such a fashion-they were brought on behalf of the named individuals and others similarly situated.  Redundant though it may seem to require consents from the named plaintiffs in a class action, the district court did not abuse its discretion in ordering such consents nor in dismissing the appellants' claims which exceeded the limitations period when no consents were filed within the applicable three year period.

Id.; see also Lee v. Vance Executive Prot., Inc., 7 F. App'x 160, 168 (4th Cir. 2001) (finding statute of limitations for named plaintiffs who clearly brought suit as a collective action was measured from the date of the consents, not the pleadings).

Plaintiffs' initial argument—that they filed their complaint in "dual capacities," both individually and as a collective action—is derived from Smith v. Central Security Bureau, Inc., 231 F. Supp. 2d 455 (W.D. Va. 2002).  In Smith, the court held that a named plaintiff who failed to file a consent to join the collective

action could nevertheless remain in the suit in his individual capacity, because his complaint showed an unambiguous intent to proceed in both an individual and collective capacity. Id. at 460–61. The Smith court reached this conclusion after reviewing the magistrate judge's detailed examination of both Food Lion and Lee, the only Fourth Circuit decisions touching on the issue. In particular, the court observed that, in both Food Lion and Lee, the Fourth Circuit "made an effort to discern from the pleadings whether the plaintiffs had brought individual cases." Id. at 461. The court then adopted the magistrate judge's conclusion that "where the record reveals an intent to file an individual claim, and the individual claim is timely filed, it should be allowed to continue, notwithstanding the individual plaintiff's failure to timely file a consent to join the collective action." Id. The Smith court's dual capacity analysis was also applied by the District of Maryland in Faust v. Comcast Cable Communications Management, LLC, 2013 WL 5587291, at *7–8 (D. Md. Oct. 9, 2013).[14]

More recently, another court in this district held that collective action plaintiffs must file a written consent to toll the statute of limitations. Reynolds v. Wyndham Vacation Resorts, Inc., No. 4:14-cv-2261, 2016 WL 362620, (D.S.C. Jan. 29, 2016), motion to certify appeal denied, 2016 WL 2347428 (D.S.C. May 4, 2016).

---

[14] The court notes that the Faust court did not explicitly recognize the viability of a dual capacity theory, but rather simply stated that "to the extent that the FLSA permits the filing of dual capacity actions, [] the [c]ourt must determine whether the record reveals an intention to file an individual claim." Faust, 2013 WL 5587291, at *7. Because the Faust court ultimately found that the record before it did not reveal such an intent, it is possible to argue that Faust leaves open the possibility that dual capacity actions are not permitted under the FLSA. Of course, if the Faust court actually believed that, it could have said so, but instead felt compelled to conduct the dual capacity analysis. Thus, the court believes the Faust decision lends support to the dual capacity theory announced in Smith.

Defendant claims that the <u>Reynolds</u> court rejected the "dual capacity" theory, or at least rejected the notion that dual capacity plaintiffs need not file a written consent to maintain the individual component of their action.  The closest the <u>Reynolds</u> court came to this position was its statement that "[t]he Fourth Circuit has held that a plaintiff proceeding in his individual and representative capacity must file a consent form with the court."  <u>Id.</u> at *2.  This language is not sufficient to sustain defendant's argument.  First, the phrase "individual <u>and</u> representative capacity" would seem to recognize that an action could be brought simultaneously in both capacities.  More importantly, this statement does not necessarily indicate that the notice requirement applies to individual actions.  As discussed above, a plaintiff bringing a collective action will always need to file some form of written consent.  Thus, the <u>Reynolds</u> court might simply have meant that a plaintiff attempting to maintain claims in dual capacities must file a written consent to maintain the collective action claim.  In any event, the <u>Reynolds</u> court ultimately held that the plaintiffs did not bring an individual action in that case, <u>id.</u> ("[I]t is abundantly clear that [the] [p]laintiffs intended to file [the] action as a collective action."), and thus, the dual capacity theory was inapplicable.

Taken together, <u>Smith</u>, <u>Faust</u>, and <u>Reynolds</u> suggest that a plaintiff may bring an FLSA action in dual capacities.  Thus, the court finds it necessary to evaluate whether the named plaintiffs "<u>clearly</u> put the employer and the court on notice of" his intention to file in an individual capacity."  <u>Faust</u>, 2013 WL 5587291, at *7 (emphasis added) (quoting <u>Smith</u>, 231 F. Supp. 2d at 461).

It is not "clear" from the complaint that the named plaintiffs intended to bring their claims in dual capacities. The title, "Collective Action Complaint," certainly does not lead one to think individual claims are at stake. See Reynolds, 2016 WL 362620, at *2 (finding it was "abundantly clear that Plaintiffs intended to file this action as a collective action" where the "original complaint explicitly states it is a 'PLAINTIFF'S ORIGINAL COLLECTIVE ACTION COMPLAINT'"). Then, under the heading "Nature of Claims," the complaint states that "[p]laintiffs bring this lawsuit against [d]efendant as a collective action pursuant to the collective action provisions of 29 U.S.C. § 216(b) on behalf of themselves and all other similarly situated employees." Compl. ¶ 2. The factual allegations themselves speak in general terms about conditions applicable to all plaintiffs and other similarly situated employees. Id. ¶¶ 13, 15, 16, 18–24, 29–34. While the complaint does state that plaintiffs bring their claims "individually and on behalf of all other similarly situated individuals," id. at 1, and includes the parenthetical "(Individual and Collective Action)" in the cause of action heading, id. at 5, these scattered references to an "individual" action do not provide the clarity needed to invoke the dual capacity argument. Faust, 2013 WL 5587291, at *8 ("A mere recitation in pleadings of the phrase 'individually and on behalf of all others similarly situated,' absent any further indication in the [c]omplaint or subsequent filings of an intention to proceed in a dual capacity, is not sufficient to put the employer and the [c]ourt on notice of an individually-filed action.").[15]  Therefore, the court finds that the complaint does not

---

[15] The court recognizes that the Smith court placed a great deal of emphasis on the fact that the plaintiffs departed from the language of Section 16(i) by stating that the action was brought "individually and on behalf of others," Smith, 231 F. Supp. 2d

clearly evidence an intent to proceed in dual capacities and, consequently, the named

plaintiffs were required to comply with the notice provision of § 216(b).

Plaintiffs next argue that, even if they were required to file consents, the

declarations submitted in support of their motion for conditional class certification

satisfied this requirement.  The Reynolds court recently cited a collection of authority

discussing a form the written consent must take, explaining as follows:

> While it is clear that some document in addition to the complaint must
> be filed, it is not clear what form the written consent must take,
> especially when the alleged party plaintiff is a named plaintiff."
> Courts have generally shown "considerable flexibility" with respect to
> the form of consent, requiring only that "the signed document verif[y]
> the complaint, indicate[] a desire to have legal action taken to protect
> the party's rights, or state[] a desire to become a party plaintiff."

Reynolds, 2016 WL 362620, at *2 (quoting Butler v. DirectSAT USA, LLC, 55 F.

Supp. 3d 793, 800 (D. Md. 2014)).  Courts have allowed "signed interrogatories and

other documents to meet the consent requirement of the FLSA on the date those

documents were filed."  Id.  Signed declarations have also been found to be sufficient.

Id.  The Butler court highlighted the fact that the documents at issue in that case

"refer[red] to the facts underlying the litigation and express[ed] [plaintiff's] view that

---

at 461, rather than "in behalf of himself [] and other employees similarly situated."
29 U.S.C. § 216(b).  This court is less persuaded by this departure.  The phrases are
simply too similar to provide a clear indication of the plaintiff's intent to bring the
action in dual capacities.  The court recognizes that it may be difficult to describe the
concept of a dual capacity action without coming fairly close to the language the
FLSA uses to describe a collective action—an action brought by plaintiff(s) "in
behalf of himself or themselves and other employees similarly situated," 29 U.S.C.
§ 216(b)—but this seems all the more reason to look past this particular phrase to
other components of the complaint.  If named plaintiffs can simply avoid the written
consent requirement by changing the words "in behalf of himself or themselves" to
"individually," then the written consent requirement might as well not apply to named
plaintiffs.  While many practitioners—not to mention courts—may think this position
worthwhile, Congress apparently does not, and that is reason enough to reject it.

the alleged practices applied to all [putative class members]." <u>Butler</u>, 55 F. Supp. 3d at 800.

The declarations submitted by plaintiffs Cole, McNeil, Dawn Dewy ("Dewey"), and Andrew Gordon ("Gordon") in support of plaintiffs' motion for conditional class certification satisfy these requirements. ECF Nos. 14-2–14-5. The fact that the declarations were submitted in support of a motion for conditional class certification alone suggests that they express the declarants' "view that the alleged practices applied to all [putative class members]." <u>Butler</u>, 55 F. Supp. 3d at 800. Each declarant opened their declaration by announcing, "I am a [p]laintiff in this action," and each declaration contains a paragraph discussing how other employees were compensated under a similar scheme. <u>See</u> ECF No. 14-2, Cole Dec. ¶ 12; ECF No. 14-3, Gordon Dec. ¶ 10; ECF No. 14-4, McNeil Dec. ¶ 13; ECF No. 14-5, Dewey Dec. ¶ 10. Because the declarations clearly demonstrated Cole, McNeil, Dewey, and Gordon's "desire to have legal action taken to protect [their] rights," <u>Reynolds</u>, 2016 WL 362620, at *2 (quoting <u>Butler</u>, 55 F. Supp. 3d at 800), the court finds such declarations may be deemed "written consents" under the FLSA.

Therefore, plaintiffs Cole, McNeil, Dewey, and Gordon may remain in this action, while the named plaintiffs who failed to file a declaration must be dismissed.

2.    **Plaintiffs Who Failed to File Consents Before the Deadline**

Defendant argues that it is entitled to summary judgment against all opt-in plaintiffs who failed to file consents within the court's scheduled deadline. ECF No. 88-1 at 13–15. Plaintiffs argue, and the court agrees, that the appropriate way to analyze this issue is through their motion for joinder of additional parties because the

late-filing opt-in plaintiffs are not currently in the action.  In that motion, plaintiffs

argue that the court has discretion to allow opt-in plaintiffs to file consents after the

deadline.  ECF No. 91 at 2–3.  Defendant contends that even if this is so, none of the

late-filing opt-in plaintiffs have demonstrated good cause for their delay.  ECF No. 99

at 5–8.

   While § 256(b) outlines the procedures for putative plaintiffs to join a

collective action, it does not specify when the putative plaintiffs must opt-in to the

action.  Regan v. City of Charleston, S.C., No. 2:13-cv-3046, 2015 WL 1299967, at

*2 (D.S.C. Mar. 23, 2015).  Rather, opt-in deadlines are set by the trial court.  Id.

Courts within this district have analyzed the following factors in ruling on this issue:

"(1) whether 'good cause' exists for the late submissions; (2) prejudice to the

defendant; (3) how long after the deadline passed the consent forms were filed;

(4) judicial economy; and (5) the remedial purposes of the FLSA."  Regan, 2015 WL

1299967, at *2 (citing Ruggles, 687 F. Supp. 2d at 37).  Though the FLSA is

remedial, it is notable that "[t]he prerogative of the district court to manage its docket

with timetables and deadlines, [] prevents even remedial statutes from stretching to

the breaking point."  Food Lion, 1998 WL 322682, at *10.

   Of the 34 opt-in plaintiffs who filed consents after the deadline, only 9 have

offered declarations explaining their delay.  ECF Nos. 97-1–97-9.  The reasons

offered for such delays vary.  Plaintiffs' counsel also submitted a declaration

explaining that an additional 9 late-filing opt-in plaintiffs changed their mailing

addresses at some point following their employment with defendant and were,

therefore, delayed in receiving their notice and consent forms.  ECF No. 97-10, Bravo

Dec. ¶ 7.  Before addressing each opt-in plaintiff's "good cause" showing individually, the court first addresses the more generalizable factors of the analysis.

### a.     Prejudice

The parties have already engaged in significant discovery in this litigation. Allowing late filers to opt in would prejudice defendant by depriving it of the opportunity to construct a defense as to those specific plaintiffs.  Thus, this factor weighs against joinder.  However, the court does not place great weight on this factor because any prejudice can be mitigated by allowing the parties to engage in additional discovery as to the newly added opt-in plaintiffs.

### b.     Length of Delay

Most of the late consent forms were filed in the week or two following the January 11, 2016 deadline.  All of the late consent forms were filed by February 24, 2016, with all but 9 coming before the month of February.  The court finds this delay to be relatively small.

### c.     Judicial Economy

Judicial economy concerns do not seem particularly strong here.  Though joinder will likely require additional discovery to avoid prejudice to defendant, the court already planned to grant plaintiff's request for additional discovery in connection with defendants' motions to compel arbitration.  If anything, this factor weighs slightly in favor of joinder.  "[I]f the Court were to deny [p]laintiffs' [m]otion, the [] potential plaintiffs may still be able to institute separate actions . . . . Accordingly, the consequences of denying joinder would likely be the same, albeit

perhaps in the context of one or more separate lawsuits." <u>Regan</u>, 2015 WL 1299967, at *3.

### d.    Remedial Purpose of FLSA

This factor, unsurprisingly, weighs in favor of joinder.  Because the late-filing opt-in plaintiffs may not have enough incentive to institute separate actions individually, permitting them to join this action would allow potential claims to move forward which might otherwise be prohibited.  This goes to the heart of the FLSA's remedial purpose.

### e.    Good Cause

Taken together, these factors weigh in favor of joinder.  However, it is also necessary to assess the reason for each opt-in plaintiff's delay.  To the extent plaintiffs have failed to demonstrate good cause for such delay, the court finds it inappropriate to allow their claims to go forward.

The court has reviewed the materials submitted in connection with this issue and finds as follows:

For **all those opt-in plaintiffs who filed a late consent form, but failed to offer any explanation as to why**, the court finds that they have failed to demonstrate good cause.

For **Shawn Jackson, Michael Watkins, Lewis Lloyd, Robert Eliot, Luis Caride, Jonathan Morris, Corey Hammett, and Andrew Duffels**, who moved from the addresses provided by defendant before plaintiff's notice was sent and had to be tracked down, the court finds there is good cause for their delay.  These

35

potential plaintiffs could not have known of this action and any inadvertence on their part appears marginal.

**James Miller** also moved and had to be tracked down, but unlike the potential plaintiffs listed above, he signed his consent over a month before the deadline and over two months elapsed before it was filed. Therefore, the court finds that he has failed to show good cause.

**Janardan Nivens** also changed his address, but he did not have to be tracked down. His consent was signed nearly a month before the deadline, yet two months passed before it was filed. Therefore, the court finds that he has failed to show good cause.

**David Baker** states that he simply forgot to mail the consent. The court finds that this does not constitute good cause.

**Kenneth Dennis** states that he initially thought the notice was junk mail. The court finds that this does not constitute good cause.

**Addision Collier** states that he did not receive his mailing until later due to an address change. The court finds that he has demonstrated good cause.

**John Cooper** states that he was working many hours during the time the notice was mailed and he forgot to mail the consent back. The court finds that this does not constitute good cause.

**Balthazar Gonzalez** states that he misplaced his notice and consent form and had to request another from plaintiffs' counsel. The court finds that this does constitute good cause. Though Mr. Gonzalez was obviously at fault for his initial mistake, he took steps to rectify that mistake and pursue his rights under the FLSA.

**Deangleo Charles** states that his cousin took his mail by mistake and he later found the notice and sent it in shortly thereafter. The court finds that this constitutes good cause becuase Mr. Charles could not have known that his cousin had taken his notice.

**Christopher Parshely** states that he misplaced his notice and consent form and had to request another from plaintiffs' counsel. The court finds that this constitutes good cause for the reasons discussed above in connection with Mr. Gonzalez.

**Kenneth Mehrlich** states that he moved after he left Tire Kingdom and, therefore, did not receive the notice until several weeks had passed. The court finds that this constitutes good cause.

In conclusion, the court finds that the following parties should be permitted to join this action: Shawn Jackson, Michael Watkins, Lewis Lloyd, Robert Eliot, Luis Caride, Jonathan Morris, Corey Hammett, Andrew Duffels, Addison Collier, Balthazar Gonzalez, Deangleo Charles, Christopher Parshely, and Kenneth Mehrlich.

### 3.     Statute of Limitations

Defendant next argues that plaintiffs' claims do not qualify for the FLSA's three-year statute of limitations for "willful" violations and, therefore, all named plaintiffs and opt-in plaintiffs' claims must be measured under the standard two-year statute of limitations. ECF No. 88-1 at 8–13. Defendant moves for summary judgment against all plaintiffs whose consent forms were filed over two years after

their last claims accrued—the date of their last paycheck.[16]  Plaintiffs contend that more discovery is needed to resolve this issue.  ECF No. 96 at 4–6.

"The FLSA provides two potential limitations periods.  For non-willful FLSA violations, a two-year statute of limitations applies.  When the violation is willful, a three-year statute of limitations applies."  Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 357 (4th Cir. 2011).  "Only those employers who 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]' have willfully violated the statute."  Id. (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).

Defendant argues that plaintiffs cannot possibly show any violations were willful, relying on the Eastern District of Virginia's opinion in Herrera v. TBC Corp., 18 F. Supp. 3d 739, 745 (E.D. Va. 2014), in which the court found that the same compensation plan at issue here fell within a valid exemption from the FLSA's overtime requirements.  ECF No. 88-1 at 11.  Defendant also highlights a recent Department of Labor investigation into defendant's South Florida stores which found no violations in defendant's compensation plan.  Id. at 12; 99-1, Maciak Dec. ¶¶ 2–4 (outlining scope of Department of Labor investigation).

These submissions each reveal that some other entity assessed defendant's compensation plan and found no FLSA violation.  This shows, at most, that defendant could have reasonably believed that its compensation plan was lawful, but it does not preclude a finding of willfulness because it reveals nothing about defendant's actual

---

[16] "A cause of action for overtime wages accrues at each regular payday immediately following the work period during which services were rendered and for which overtime compensation is claimed."  Truslow v. Spotsylvania Cty. Sheriff, 783 F. Supp. 274, 279 (E.D. Va. 1992).

inquiry into the plan's legality under the FLSA.  The existence of certain grounds for adopting a belief does not show that it was actually adopted.[17]  Put differently, the fact that the Eastern District of Virginia and the Department of Labor both thought the compensation plan was lawful does not necessarily mean defendant thought the compensation plan was valid.[18]  Because discovery has not yet closed, it is still entirely possible that plaintiffs will provide evidence that defendant knew, or had reckless disregard for, whether its compensation plan violated the FLSA.

In fact, plaintiffs' counsel filed an affidavit describing the outstanding discovery issues that touch on the willfulness inquiry.  ECF No. 96-1, Tucker Dec. ¶¶ 14, 15.  Plaintiffs highlight several interrogatories seeking the identity of persons involved in implementing defendant's compensation plan and the steps taken to implement that plan.  Id.  Defendant's answers to the interrogatories indicate that defendant is attempting to find these individuals and supplement its answers.  Id. Plaintiffs also state that they plan to address the willfulness issue in their deposition of defendant's corporate representative.  Id. ¶ 17.

In light of these outstanding discovery issues, the court is not in any position to grant defendant's motion for summary judgment on the issue of willfulness. Defendant's own evidence on the issue is probative, but not dispositive, and while

---

[17] Of course, it would have been impossible for defendants to rely on the Herrera court's decision or the Department of Labor's conclusions in evaluating the legality of their compensation plan, given that the plan was established well before either the Herrera case or the Department of Labor investigation even existed.

[18] The court also notes, as it did in the conditional certification order, that "Herrera focused on the requirement that there be 'some element of proportionality' between employees' commissions and the prices charged to customers, Herrera, 18 F. Supp. 3d at 747, [but] the proportionality requirement is not the only reason a purported commission plan may not qualify as bona fide under FLSA § 7(i)."  ECF No. 40 at 17.

plaintiff has yet to establish the existence of a material issue of fact, a significant amount of discovery remains.

Thus, the opt-in plaintiffs who filed their consent within three years, but not two years, of receiving their final paycheck may remain in this action at this time. See Truslow, 783 F. Supp. at 279 ("A cause of action for overtime wages accrues at each regular payday immediately following the work period during which services were rendered and for which overtime compensation is claimed."); LaFleur v. Dollar Tree Stores, Inc., 2012 WL 4739534, at *6 (E.D. Va. Oct. 2, 2012) ("The FLSA, 29 U.S.C. §§ 216(b) and 256, requires that the statute of limitations continue to run for a potential claimant in an FLSA collective action until he or she consents in writing to become a party plaintiff."). Nevertheless, defendant has also identified a number of would be opt-in plaintiffs whose consent was not even timely under the three year statute of limitations. Plaintiff has not offered any argument as to why these individuals should remain in this action. Therefore, the court grants summary judgment as to all opt-in plaintiffs whose consent was filed over three years after their final paycheck.

### 4.     Various Unaccounted for Opt-In Plaintiffs

Finally, defendant asks the court to grant summary judgment against a variety of potential plaintiffs who it claims are not proper plaintiffs in this action. ECF No. 88-1 at 15. Specifically, defendant contends that five of the opt-in plaintiffs were mistakenly included on the opt-in list and do not satisfy the conditional class criteria, defendant has been unable to identify four of the opt-in plaintiffs, three of the opt-in plaintiffs are John Does, and it appears that one opt-in plaintiff filed two consent

forms.  Fourth Filoon Dec. ¶¶ 6–8.  The common thread linking these potential

plaintiffs is defendant's assertion that they simply do not qualify for inclusion in the

conditionally certified class.  Plaintiff has not addressed these miscellaneous issues.

The court therefore grants defendant's motion for summary judgment against these

plaintiffs—of course, only one of the "duplicate" plaintiffs may be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** defendant's motion to compel

arbitration for Cole, and **GRANTS** in part and **DENIES** in part defendant's motion to

compel arbitration for all other opt-in plaintiffs who signed the Agreement.

Specifically, the court grants defendant's motion as to all relevant opt-in plaintiffs

except (1) those who electronically signed the Agreement through the employee

portal, rather than the Kronos System, and who left their employment with defendant

shortly thereafter; and (2) those who have submitted sworn affidavits claiming that

their supervisors frequently accessed their employee portals and completed required

tasks "for them."  The court will hold an evidentiary hearing on the issue of whether

Cole and the other opt-in plaintiffs agreed to be bound by the Agreement and allow

the parties to conduct limited discovery in connection with that hearing.

The court also **GRANTS** defendant's motion for summary judgment with

respect to (1) named plaintiffs Donald Wrighton and Jacob Grissom, who failed to

file a consent form, (2) all opt-in plaintiffs whose consent was filed over three years

after receiving their final paycheck, and (3) all individuals who cannot be identified

or have failed to demonstrate that they were actually employed as mechanics at a Tire

Kingdom during the class period, see Fourth Filoon Dec. ¶¶ 6–8.  The court **DENIES**

defendant's motion for summary judgment in all other respects.  Lastly, the court

**GRANTS** plaintiffs' motion for joinder of additional parties as to Shawn Jackson,

Michael Watkins, Lewis Lloyd, Robert Eliot, Luis Caride, Jonathan Morris, Corey

Hammett, Andrew Duffels, Addision Collier, Balthazar Gonzalez,  Deangleo Charles,

and  Christopher Parshely; and **DENIES** plaintiff's motion for joinder of additional

parties as to all opt-in plaintiffs who filed a late consent, but failed to offer any

explanation, James Miller, Janardan Nivens, David Baker, John Cooper, and Kenneth

Dennis.

        **AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 11, 2016**
**Charleston, South Carolina**