1
2
3
4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

5  ANDREW GORDON, TAVIS MCNEIL,        )
6  DONALD WRIGHTON, NICHOLAS COLE,     )
7  JACOB GRISSON, AND DAWN DEWEY,      )
8  *on behalf of themselves and others similarly*  )
9  *situated*,                          )
10                                       )
11                    Plaintiffs,        )
12                                       )        No. 2:14-cv-3365-DCN
13           vs.                         )
14                                       )        **ORDER**
15  TBC RETAIL GROUP, INC., *d/b/a*      )
16  TIRE KINGDOM,                       )
17                                       )
18                    Defendant.         )
19  _____ )
20

21        This matter is before the court on defendant TBC Retail Group, Inc.'s, d/b/a Tire

22  Kingdom ("TBC"), motion for summary judgment and decertification, ECF No. 152, and

23  Andrew Gordon, Tavis McNeil, Donald Wrighton, Nicholas Cole ("Cole"), Jacob

24  Grisson, Dawn Dewey's (collectively "plaintiffs") motion for summary judgment, ECF

25  No. 153. For the reasons set forth below, the court grants in part and denies in part

26  TBC's motion for summary judgment, grants in part and denies in part plaintiffs' motion

27  for summary judgment, and takes under advisement on TBC's motion for decertification

28  until additional briefs are filed.

29                        **I.  BACKGROUND**

30        Plaintiffs were employed by TBC as mechanics in TBC's South Carolina stores.

31  Compl. ¶ 1. Plaintiffs and other mechanics employed by TBC during the relevant time

32  period were responsible for inspecting, diagnosing, repairing, and servicing automobiles.

33  Id. ¶¶ 13–14. All mechanics employed by TBC during the relevant time period were, and

1

1   continue to be, paid pursuant to the same compensation plan.  Id. ¶ 16; Answer ¶¶ 15, 16,

2   19, 22, 23, and 31.  Under this plan, a mechanic's total compensation is composed of two

3   basic components.  First, each mechanic is paid an amount determined by multiplying the

4   particular mechanic's "flat rate"—an hourly pay rate assigned to each mechanic based on

5   that mechanic's particular skill, experience, and certifications—by the mechanic's

6   "turned hours"—a pre-established amount of time designated by TBC for each

7   mechanical task—for all tasks completed by the mechanic during the relevant pay period.

8   Answer ¶ 16; ECF No. 6 at 4.  Thus, this "turned hours" component of a mechanic's

9   compensation ("Turned Hours Pay") does not account for the actual time spent working

10  on a particular task or during the pay period overall.  Id. at 2.  Instead, Turned Hours Pay

11  is based exclusively on the number of tasks completed and the pre-assigned "turned

12  hours" for such tasks.  Id. at 5–6.  The same measure of "turned hours" used to form a

13  mechanic's Turned Hours Pay for a particular task is used as the basis for the labor costs

14  charged to the customer for that task, though the rates paid by the customers are, of

15  course, greater than mechanics' "flat rates."  Id. at 5.

16      When the amount of a mechanic's Turned Hours Pay earned over a given pay

17  period is less than one and one-half times the statutory minimum wage multiplied by the

18  mechanic's actual hours worked during the same period, TBC pays a supplemental

19  amount, referred to as "differential pay."  Answer ¶ 19; ECF No. 6 at 6.  This

20  "differential pay" is set at whatever amount is needed to render the mechanic's total

21  compensation—i.e. Turned Hours Pay plus "differential pay"—equal to $11.02 per hour

22  for all actual hours worked during the period.  Answer ¶ 19; ECF No. 6 at 6.  As a result,

23  if a mechanic's "turned hours" fall below a certain percentage of their actual hours, TBC

1    compensates the mechanic as if they earned a straightforward wage of $11.02 per hour.

2    This "differential pay" is designed to ensure that mechanics always earn at least one and

3    one-half time the statutory minimum wage for all actual hours worked.  Answer ¶ 19;

4    ECF No. 6 at 6.

5          On August 20, 2014, plaintiffs filed their complaint against TBC for violations of

6    the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.  Specifically, plaintiffs

7    accused TBC of violations of the overtime requirements as stated in 29 U.S.C. § 207(a).

8    On September 30, 2015, the court granted plaintiffs' motion for conditional class

9    certification pursuant to the collective action provisions of 29 U.S.C. §216(b).  ECF No.

10   40.  On August 11, 2016, the court entered an order on several motions:  denying TBC's

11   motion to compel Cole to arbitrate, denying in part and granting in part the TBC's motion

12   to compel arbitration for all other opt-in plaintiffs who signed the arbitration agreement,

13   granting in part and denying in part TBC's motion for summary judgment, and granting

14   in part and denying in part plaintiffs' motion for joinder ("multi-motion order").  ECF

15   No. 112.  In denying part of TBC's motion for summary judgment, the court stated that at

16   that time it was "not in any position to grant defendant's motion for summary judgment

17   on the issue of willfulness" because "a significant amount of discovery remains."  Id. at

18   39–40.  On September 13, 2017, the court stayed the case, pending the outcome of Epic

19   Systems v. Lewis, Docket No. 16-285, which was about to be heard before the United

20   States Supreme Court.  ECF No. 118.  On July 18, 2018, the court issued an order

21   denying the plaintiffs' motion to reconsider the multi-motion order and lifting the stay.

22   ECF No. 133.

1    On November 5, 2019, TBC's Senior Vice President and Chief Human Resource

2    Officer Terri Hoskins ("Hoskins") was deposed as TBC's Rule 30(b)(6) designee.  ECF

3    116-1 ("Hoskins 2019 Depo").  On January 17, 2020, Hoskins was again deposed.  ECF

4    No. 152-11 (together with Hoskins 2019 Depo, "Hoskins Depos"). On February 7, 2020,

5    TBC filed a motion for summary judgment and decertification.  ECF No. 152.  On the

6    same day, plaintiffs also filed a motion for summary judgment.  ECF No. 153.  Each of

7    the parties' motion for summary judgment asked the court to rule in their favor regarding

8    whether the TBC method of compensation is a bona fide commission plan under the

9    FSLA—and if so, whether it is exempted from overtime by 29 U.S.C. § 207(i) ("Section

10   7(i)").  ECF No. 152-1 at 27; ECF No. 153 at 2.  In furtherance of their argument that

11   TBC does not have a bona fide commission plan, plaintiffs asserted TBC never

12   established a proper representative period as required by the regulations governing

13   Section 7(i).  ECF No. 153 at 2 (quoting 29 C.F.R. § 779.417(d)).  In TBC's response to

14   plaintiff's motion for summary judgment, filed on February 28, 2020, TBC stated that it

15   "uses a designated one-year representative period for reviewing mechanics'

16   compensation under the bona fide Section 7(i) pay plan."  ECF No. 157 at 11.  To verify

17   its use of a one-year representative period, TBC submitted a declaration given by

18   Hoskins, whereby she attested to TBC's use of a one-year representative period.  ECF

19   No. 157-1 ("Hoskins first declaration").

20   On February 28, 2020, plaintiffs responded to TBC's motion for summary

21   judgment, ECF No. 156, to which TBC replied on March 6, 2020, ECF No. 159.  In their

22   reply, TBC submitted a second declaration given by Hoskins, whereby Hoskins again

23   attested to TBC's use of a one-year representative period.  ECF No. 159-1 (together with

1   Hoskins first declaration, "Hoskins declarations").  On March 6, 2020, plaintiffs replied

2   to TBC's response to their motion for summary judgment together with a motion to strike

3   the Hoskins declarations.  ECF No. 160.  On March 18, 2020, plaintiffs refiled their

4   motion to strike as a separate motion.  ECF No. 161.[1]  On March 20, 2020, TBC

5   responded to plaintiffs' motion to strike, ECF No. 162.  On April 1, 2019, the court held a

6   hearing on plaintiffs' motion to strike.  ECF No. 165.  After the hearing, the court asked

7   the parties to submit supplemental briefing and documents regarding discovery requests

8   and questions asked in the Hoskins Depos.  On April 2, 2020, both parties submitted the

9   requested documentation, ECF No. 166–67.  On April 8, 2020, the court denied

10  plaintiffs' motion to strike.  ECF No. 168.  These motions have been fully briefed and are

11  now ripe for the court's review.

12                                    **II.  STANDARD**

13      **A.  Summary Judgment**

14          Summary judgment shall be granted "if the pleadings, the discovery and

15  disclosure materials on file, and any affidavits show that there is no genuine dispute as to

16  any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

17  Civ. P. 56(c).  Rule 56(c) of the Federal Rules of Civil Procedure requires that the district

18  court enter judgment against a party who, "'after adequate time for discovery . . . fails to

19  make a showing sufficient to establish the existence of an element essential to that party's

20  case, and on which that party will bear the burden of proof at trial.'"  Stone v.

21  Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v.

22  Catrett, 477 U.S. 317, 322 (1986)).  "[T]his standard provides that the mere existence of

---

[1]  ECF No. 160 and ECF No. 161 are the same document.

1    some alleged factual dispute between the parties will not defeat an otherwise properly

2    supported motion for summary judgment; the requirement is that there be no genuine

3    issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

4    "Only disputes over facts that might affect the outcome of the suit under the governing

5    law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary

6    judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

7    evidence is such that a reasonable jury could return a verdict for the nonmoving party."

8    Id.

9        "[A]t the summary judgment stage the judge's function is not himself to weigh

10   the evidence and determine the truth of the matter but to determine whether there is a

11   genuine issue for trial." Id. at 249. When the party moving for summary judgment does

12   not bear the ultimate burden of persuasion at trial, it may discharge its burden by

13   demonstrating to the court that there is an absence of evidence to support the non-moving

14   party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must

15   then "make a showing sufficient to establish the existence of an element essential to that

16   party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

17       Any reasonable inferences are to be drawn in favor of the nonmoving party.

18   Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir.

19   2012). However, to defeat summary judgment, the nonmoving party must rely on more

20   than conclusory allegations, mere speculation, the building of one inference upon

21   another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at

22   252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion

23   for summary judgment...must 'set forth specific facts showing that there is a genuine

1    issue for trial.'"  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522

2    (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)).  If the adverse

3    party fails to provide evidence establishing that the fact finder could reasonably decide in

4    his favor, then summary judgment shall be entered "regardless of '[a]ny proof or

5    evidentiary requirements imposed by the substantive law.'"  Id. (quoting Anderson, 477

6    U.S. at 248).

7    **B.  Decertification**

8        Under the FLSA, individual employees may institute a collective action against

9    their employer on behalf of themselves and other similarly situated employees.  Section

10   216(b) of the FLSA states:

11           An action . . . may be maintained against any employer . . . in any Federal
12           or State court of competent jurisdiction by any one or more employees for
13           and on behalf of himself or themselves and other employees similarly
14           situated.  No employee shall be a party plaintiff to any such action unless
15           he gives his consent in writing to become such a party and such consent is
16           filed in the court in which such action is brought.
17
18   29 U.S.C. § 216(b).  The mechanism outlined in § 216(b) is designed to facilitate the

19   efficient adjudication of similar claims by "similarly situated" employees by permitting

20   the consolidation of individual claims and the pooling of resources in prosecuting such

21   actions against their employers.  Gordon v. TBC Retail Group, Inc., 134 F. Supp. 3d.

22   1027, 1031 (D.S.C. 2015); see also Hoffmann–La Roche Inc. v. Sperling, 493 U.S. 165,

23   170 (1989); LaFleur v. Dollar Tree Stores, Inc., 30 F. Supp. 3d 463, 467 (E.D. Va. 2014).

24   In deciding whether the named plaintiffs in an FLSA action are "similarly situated" to

25   other potential plaintiffs, courts generally employ a two-stage approach.  Gordon, 134 F.

26   Supp. 3d. at 1031; see also Pelczynski v. Orange Lake Country Club, Inc., 284 F.R.D.

1    364, 367 (D.S.C. 2012); Simons v. Pryor's, Inc., 2011 WL 6012484, at * 1 (D.S.C. Nov.

2    30, 2011).

3          The first step in this process is the "notice," or "conditional certification," stage.

4    Gordon, 134 F. Supp. 3d. at 1031 (quoting Purdham v. Fairfax County Pub. Sch., 629 F.

5    Supp. 2d 544, 547 (E.D. Va. 2009)).  With regard to this conditional certification stage,

6    "[t]he Supreme Court has held that, in order to expedite the manner in which collective

7    actions under the FLSA are assembled, 'district courts have discretion[,] in appropriate

8    cases[,] to implement ... § 216(b) ... by facilitating notice to potential plaintiffs.'"

9    Purdham, 629 F. Supp. 2d at 547 (quoting Hoffmann–La Roche, Inc., 493 U.S. at

10   169); see Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 74 (2013) ("'[C]onditional

11   certification' does not produce a class with an independent legal status, or join additional

12   parties to the action.  The sole consequence of conditional certification is the sending of

13   court-approved written notice to employees, who in turn become parties to a collective

14   action only by filing written consent with the court." (citing § 216(b))).  At this stage, the

15   plaintiff must demonstrate that the proposed class members are "similarly situated" and

16   that notice is "appropriate."  Id. at 548.  Ordinarily, the plaintiff's burden at this initial

17   stage is fairly lenient, requiring only a modest factual showing that members of the

18   proposed class are "victims of a common policy or plan that violated the law."  Gordon,

19   134 F. Supp. 3d. at 1031–32; Regan v. City of Charleston, S.C., 2014 WL 3530135, at *2

20   (D.S.C. July 16, 2014); Long v. CPI Sec. Sys., Inc., 292 F.R.D. 296, 298–99 (W.D.N.C.

21   2013); Essame v. SSC Laurel Operating Co. LLC, 847 F. Supp. 2d 821, 824–25 (D. Md.

22   2012); Steinberg v. TQ Logistics, Inc., 2011 WL 1335191, at *1 (D.S.C. Apr. 7,

23   2011); Purdham, 629 F. Supp. 2d at 547–48.

1     "Second, after the court has conditionally certified the class, the potential class

2     members have been identified and notified, and discovery has been completed, 'a

3     defendant may then move to decertify the collective action, pointing to a more developed

4     record to support its contention that the plaintiffs are not similarly situated . . .'" Gordon,

5     134 F. Supp. 3d. at 1032; Regan, 2014 WL 3530135, at *3 (quoting Pelczynski, 284

6     F.R.D. at 368); Purdham, 629 F. Supp. 2d at 547.  At this "decertification stage" the court

7     applies a heightened, fact-specific standard to the "similarly situated" analysis, Regan,

8     2014 WL 3530135, at *3, and considers various additional factors, including: (1) the

9     disparate factual and employment settings of the individual plaintiffs; (2) the various

10    defenses available to defendants that appear to be individual to each plaintiff; and (3)

11    fairness and procedural considerations.  Gordon, 134 F. Supp. 3d. at 1032.  If the court

12    determines that the plaintiffs are not, in fact, similarly situated, the court may decertify

13    the class, dismiss without prejudice the opt-in plaintiffs' claims, and permit the named

14    plaintiffs to proceed on their individual claims.  Holmes v. Charleston Retirement

15    Investors, LLC, 115 F. Supp. 3d 653, 657 (D.S.C. 2014).

16                              **III.  DISCUSSION**

17         **A.  Summary Judgment**

18         TBC argues the court should grant summary judgment in their favor because their

19    commission rate is "bona fide" in accordance with Section 7(i)'s overtime exemption

20    requirements.  ECF No. 152-1 at 11–18.  Plaintiffs contend that the court should grant

21    summary judgment in their favor because TBC's commission rate is a "sham" and does

22    not meet the requirements to qualify for the Section 7(i) overtime exemption.  ECF No.

23    153 at 14–20.  TBC also argues that the court should grant summary judgment against all

1    plaintiffs who failed to file written consents within two-years because plaintiffs cannot

2    meet their burden of establishing a willful violation.  ECF No. 152-1 at 18–20.  Plaintiffs

3    contend that the totality of TBC's conduct demonstrates "a clear pattern of reckless

4    disregard for the FLSA," and as such, the court should find that a three-year statute of

5    limitations applies in this instance and deny TBC's motion for summary judgment with

6    respect to plaintiffs who filed their written consents within such three-year period.  ECF

7    No. 156 at 8–12.  Finally, TBC argues that the court should grant summary judgment

8    during the weeks for which plaintiffs have stipulated that they can assert no claim for

9    overtime compensation under the FLSA.  ECF No. 152-1 at 20–21; ECF No. 152-3; ECF

10    No. 152-4.

11        The court will begin its analysis by examining the plaintiffs' stipulation of

12    circumstances where no claim for overtime can be made, then turn its attention to the

13    statute of limitation arguments, and finally examine if TBC's compensation plan meets

14    the requirements under Section 7(i) to allow for exemption from overtime under the

15    FLSA.

16    **1.  Stipulated Claims**

17        TBC argues that because plaintiffs stipulated that they can assert no claim for

18    overtime compensation under the FLSA for certain weeks, the court should grant

19    summary judgment for claims that arose during those weeks.  ECF No. 152-1 at 20–21;

20    ECF No. 152-3; ECF No. 152-4.  Plaintiffs do not contest this argument.  Therefore, the

21    court grants summary judgment in favor of TBC for the weeks that plaintiffs stipulated

22    no claim for overtime compensation under the FLSA can be made.

23

1             **2.  Statute of Limitations**

2        TBC argues that the court should grant summary judgment against all plaintiffs

3 who failed to file written consents within two-years because plaintiffs cannot meet their

4 burden of establishing a willful violation.  ECF No. 152-1 at 18–20.  Plaintiffs contend

5 that the totality of TBC's conduct demonstrates "a clear pattern of reckless disregard for

6 the FLSA," and as such, the court should find that a three-year statute of limitations

7 applies in this instance and deny TBC's motion for summary judgment for plaintiffs who

8 filed their written consents within such three-year period.  ECF No. 156 at 8–12.

9        "The FLSA provides two potential limitations periods.  For non-willful FLSA

10 violations, a two-year statute of limitations applies.  When the violation is willful, a

11 three-year statute of limitations applies."  Desmond v. PNGI Charles Town Gaming,

12 L.L.C., 630 F.3d 351, 357 (4th Cir. 2011).  "Only those employers who 'either knew or

13 showed reckless disregard for the matter of whether its conduct was prohibited by the

14 [FLSA]' have willfully violated the statute."  Id. (quoting McLaughlin v. Richland Shoe

15 Co., 486 U.S. 128, 133 (1988)).  "Reckless disregard of the requirements of the [FLSA]

16 means failure to make adequate inquiry into whether conduct is in compliance with the

17 [FLSA]."  5 C.F.R. § 551.104.  Conduct that is merely unreasonable or negligent fails to

18 satisfy the willfulness standard.  McLaughlin, 486 U.S. at 133.  "All of the facts and

19 circumstances . . . are taken into account in determining whether a violation was willful."

20 Id.  In sum, "if an employer acts unreasonably, but not recklessly, in determining its legal

21 obligation," it is not acting "willfully."  Id. at n. 13.  In an alleged FLSA violation

22 dispute, plaintiffs bear the burden of proof when alleging a violation is willful.  Perez v.

23 Mountaire Farms, Inc., 650 F.3d 350, 375 (4th Cir. 2011).  "Although this is ultimately a

1    question of fact, a plaintiff must present sufficient evidence of willfulness to survive

2    summary judgment." Randolph v. PowerComm Const., Inc., 309 F.R.D. 349, 364 (D.

3    Md. 2015) (quoting Hantz v. Prospect Mortg., LLC, 11 F. Supp. 3d 612, 617 (E.D. Va.

4    2014).

5         Plaintiffs concede that failure to consult with a lawyer cannot alone demonstrate a

6    willful violation.  ECF No. 156 at 9.  However, plaintiffs contend that TBC's failure to

7    consult with an employment lawyer or with the Department of Labor ("DOL") when they

8    implemented the compensation plan at issue combined with their other conduct, is

9    sufficient to establish a willful violation.  Id.  Plaintiffs rely on Sellers v. Keller

10   Unlimited LLC, to argue that the totality of TBC's conduct demonstrates a reckless

11   disregard of the FLSA.  388 F. Supp. 3d 646, 652 (D.S.C. 2019).  Other than failing to

12   consult a lawyer when implementing the plan initially, the facts in this instance are not

13   analogous to Sellers.  In Sellers, the district court found the defendants conduct to be

14   reckless because the defendants continued to implement their compensation plan even

15   after being notified by the DOL that their plan violated the FLSA.  388 F. Supp. 3d at

16   651–52.  Here, conversely, TBC's corporate counsel worked with the DOL during an

17   investigation of their compensation plan, and an audit by the DOL revealed no violations

18   of the FLSA.  ECF No. 99-1.  Plaintiffs have provided no evidence that TBC was on

19   notice that their compensation plan was in violation of the FLSA.

20        The court determined it was not in a position to rule on this matter earlier in the

21   proceedings and left open the possibility that once discovery closed plaintiffs would

22   "provide evidence that TBC knew, or had reckless disregard for, whether its

23   compensation plan violated the FLSA."  ECF No. 118 at 39.  However, discovery has

1   now closed and plaintiffs have failed to provide such evidence.  Courts have found

2   employers willfully violated the FLSA when those companies ignored unequivocal

3   warnings that they were out of compliance with the FLSA, destroyed or withheld records

4   to block investigations into their employment practices, or split employees' hours

5   between two companies' books to conceal their overtime work.  See Herman v. Palo

6   Group Foster Home, Inc., 183 F.3d 468, 474 (6th Cir. 1999); Martin v. Deiriggi, 985 F.2d

7   129, 136 (4th Cir. 1992); Randolph v. PowerComm Const., Inc., 309 F.R.D. 349, 364 (D.

8   Md. 2015); Hurd v. NDL, Inc., 2012 WL 642425, at *6 (D. Md. Feb. 27, 2012); Cubias v.

9   Casa Furniture and Bedding, LLC, 2007 WL 150973 *3 (E.D. Va. 2007).  Plaintiff have

10  not shown any evidence that TBC engaged in any conduct of that nature.  Instead,

11  plaintiffs contend that TBC's norm of a 50-hour work week, the guaranteed wage rate

12  being more than one and half times the minimum wage, and their alleged failure to

13  identify a representative period for their compensation plan are sufficient to show a

14  willful violation of the FLSA.  ECF No. 156 at 10–11.  Plaintiffs contention is misguided.

15  Having a norm of a 50-hour work week is not a mandatory violation of the FLSA

16  overtime requirements.  Ensuring more than one and half times the minimum wage is a

17  requirement of Section 7(i), and complying with a provision of the FLSA is not evidence

18  of willful misconduct.  Furthermore, contrary to plaintiffs' claim, ECF No. 156 at 10,

19  TBC did identify a representative period for their compensation plan, ECF No. 157-1;

20  ECF No. 159-1.

21      In short, plaintiffs have not provided sufficient evidence that TBC knowingly

22  violated or recklessly disregarded the FLSA.  When viewing the facts in the light most

23  favorable to the non-moving party, the court finds that plaintiffs failed to meet their

13

burden that TBC willfully violated the FLSA, and therefore, the court grants TBC's

motion for summary judgment for all plaintiffs who failed to file written consents within

the two-year statute of limitation.[2]

### 3. Bona Fide Commission Rate

An employer can be exempt from the overtime requirements in § 207(a) if it

meets the requirements set forth in Section 7(i).  Section 7(i) states:

> No employer shall be deemed to have violated subsection (a) by employing
> any employee of a retail or service establishment for a workweek in excess
> of the applicable workweek specified therein, if (1) the regular rate of pay
> of such employee is in excess of one and one-half times the minimum hourly
> rate applicable to him under section 206 of this title, and (2) more than half
> his compensation for a representative period (not less than one month)
> represents commissions on goods or services.  In determining the proportion
> of compensation representing commissions, all earnings resulting from the
> application of a bona fide commission rate shall be deemed commissions
> on goods or services without regard to whether the computed commissions
> exceed the draw or guarantee.

29 U.S.C. 207(i).  "Whether an employee is exempt from the FLSA's overtime

requirements is a mixed question of law and fact."  Williams v. Genex Servs., LLC, 809

F.3d 103, 109 (4th Cir. 2015).  "The question of how the [employees] spent their working

time . . . is a question of fact.  The question whether their particular activities excluded

them from the overtime benefits of the FLSA is a question of law."  Icicle Seafoods, Inc.

v. Worthington, 475 U.S. 709, 714 (1986); see also Walton v. Greenbrier Ford, Inc., 370

F.3d 446, 450 (4th Cir. 2004) ("The determination of whether an employee falls within

the scope of a FLSA exemption is ultimately a legal question.").  The court is now

required to apply a fair reading of the exemption, rather than the previously-accepted

---

[2]  This finding includes plaintiffs identified as "3-Year SOL Opt-In Plaintiffs" in the
document labeled "Chart of Remaining Plaintiffs."  ECF No. 152-13 at 3–5.

1    narrow reading.  See Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018)

2    ("Because the FLSA gives no 'textual indication' that its exemptions should be construed

3    narrowly, there is no reason to give [them] anything other than a fair (rather than a

4    'narrow') interpretation").

5         Plaintiffs concede that TBC is a retail establishment and that plaintiffs' regular

6    rate of pay was in excess of one and one-half times the minimum hourly rate, therefore

7    initially satisfying the first two requirements of Section 7(i).  ECF No. 153 at 13.  Where

8    the contention arises is with TBC's purported compliance with the third requirement of

9    Section 7(i) — that more than half the compensation for plaintiffs in the representative

10    period represents commissions on goods or services.  Because all earnings resulting from

11    the application of a bona fide commission rate must be deemed commissions under

12    Section 7(i), the court will now examine if TBC's compensation plan applies a "bona fide

13    commission rate" that would allow TBC to be exempt from the overtime requirements in

14    § 207(a).

15         When deciding questions of statutory interpretation, the court begins with the text

16    of the statute.  Othi v. Holder, 734 F.3d 259, 265 (4th Cir. 2013).  However, neither the

17    FLSA nor the DOL regulations provide a definition for the term "commission" as it is

18    used in the retail or service exemption.  See Wilks v. Pep Boys, 278 F. App'x 488, 489

19    (6th Cir. 2008); Parker v. NutriSystem, Inc., 620 F.3d 274, 278 (3d Cir. 2010).  "Indeed,

20    the meaning of 'commission' under the FLSA 'is an issue that finds little illumination

21    from the sparse case law and the vague references in statutes and regulations.'"

22    McAninch v. Monro Muffler Brake Inc., 799 F. Supp. 2d 807, 813 (S.D. Ohio 2011)

23    (quoting Klinedinst v. Swift Investments, Inc., 260 F.3d 1251, 1254 (11th Cir. 2001)).

1    The lack of case law and ambiguity in the statutes and regulations have led other courts to

2    use a variety of methods when determining a bona fide commission rate.

3        Some courts have focused on the typical compensation methods for employees of

4    retail or service establishments under § 29 C.F.R. § 779.413(a).  See Viciedo v. New

5    Horizons Computer Learning Ctr. of Columbus, Ltd., 246 F. Supp. 2d 886, 890 (S.D.

6    Ohio 2003); Donovan v. Highway Oil, Inc., 1986 WL 11266, at *3 (D. Kan. July 18,

7    1986).  Other courts have looked to the language in § 29 C.F.R. § 779.416(c) to see if the

8    employee "always or almost always earns the same fixed amount of compensation for

9    each workweek (as would be the case where the computed commissions seldom or never

10   equal or exceed the amount of the draw or guarantee)".  See McAninch, 799 F. Supp. 2d

11   at 813 (holding that an employee exceeding the guarantee 19% of the time "easily

12   constitute more than seldom."); Herman v. Suwannee Swifty Stores, Inc., 19 F.Supp.2d

13   1365, 1371 (M.D.Ga.1998) (finding that never exceeding the guarantee or only exceeding

14   it once a year was "clearly not" a bona fide commission rate, but refusing to grant

15   employees summary judgment motion for employees who exceeded the guarantee only

16   two to four times a year).

17       Still, other courts have shifted away from the regulations when defining what

18   constitutes a bona fide commission rate.  In Casanova v. Gold's Texas Holdings Grp.,

19   Inc., the district court extracted factors that the Third and Seventh Circuits have used to

20   make such a determination:

21       First, a bona fide commission is either a percentage or proportion of the
22       ultimate price passed on to the consumer.  See Parker, 620 F.3d at 283; Yi
23       v. Sterling Collision Ctrs., Inc., 480 F.3d 505, 508 (7th Cir. 2007).  Second,
24       a bona fide commission is decoupled from actual time worked, so that there
25       is an incentive for the employee to work more efficiently and effectively.
26       See Parker, 620 F.3d at 284; Yi, 480 F.3d at 509; Charlot v. Ecolab, Inc.,

1    136 F. Supp. 3d 433, 451 (E.D.N.Y. 2015). Third, the type of work is such
2    that its "peculiar nature" does not lend itself to a standard eight-hour work
3    day. Alvarado v. Corp. Cleaning Servs., Inc., 782 F.3d 365, 368 (7th Cir.
4    2015). Fourth, the compensation system must not offend the purposes of
5    the FLSA. Id. No factor appears dispositive in the case law, but the first
6    two seem to carry the most weight.

8    2016 WL 1241548, at *8 (W.D. Tex. Mar. 23, 2016). Some courts have shifted away

9    from the regulations but embraced a less formulaic approach, applying "a smell test, one

10   that reaches beyond the formal structure of the commission rate and into its actual effects

11   and the purpose behind it." Leal v. Magic Auto Touch Up, Inc., 2018 WL 297339, at *3

12   (N.D. Tex. Jan. 4, 2018) (internal quotation marks omitted) (quoting Erichs v. Venator

13   Grp., Inc., 128 F.Supp.2d 1255, 1260 (N.D. Cal. 2001)). In short, there is no one

14   established standard for evaluating what constitutes a bona fide commission rate under

15   the FLSA.

16   TBC argues its Turned Hours Pay compensation plan utilizes the industry-

17   accepted "flat rate" system which is recognized as a bona fide commission rate, and

18   therefore, the court should grant summary judgment in its favor that the compensation

19   plan utilizes a bona fide commission rate. ECF No. 152-1 at 14. TBC also argues that

20   because their employees pay fluctuated from week to week, its compensation plan

21   utilizes a bona fide commission rate under § 779.416(c). Id. at 15. Plaintiffs argue that

22   TBC's compensation plan is not analogous to the typical "flat rate" system because of the

23   method of compensation TBC utilizes when the Turned Hours Pay is not greater that one

24   and half times the minimum wage, and therefore, the court should grant summary

25   judgment in its favor that the compensation plan does not utilize a bona fide commission

26   rate. ECF No. 153 at 19. Plaintiffs also contend that TBC's commission rate is not bona

27   fide according to § 779.416(c) because the commission rate never affected the rate of pay

1    for its employees.  Id. at 17.  The court will first examine if TBC's use of different

2    compensation methods in one plan constitutes a bona fide commission rate.

3                **a.  Turned Hours Pay Hybrid Plan**

4          Several courts have held that the Turned Hours Pay compensation plan utilized by

5    TBC constitutes bona fide commission rate for purposes of Section 7(i).  See, e.g.,

6    Parker, 620 F.3d at 283 (concluding that a meal plan provider that paid sales associates

7    on a commission basis when the associates received flat rates according to the sales they

8    made was a bona fide commission rate); Yi, 480 F.3d at 509-10 (holding Section 7(i)

9    exemption applies where compensation determined by multiplying the number of booked

10    hours for the job by the ratio of the team member's actual hours worked to the total hours

11    worked by the team, and then by a wage per booked (not actually worked) hour, based on

12    the skill or quality of the individual team member); Klinedinst, 260 F.3d at 1256 (noting

13    that "[p]ayments of between $12 and $15 per flagged hour provide incentives for

14    employees to work efficiently and effectively to the benefit of the employer, who may

15    then take on more customers at a greater profit margin, and the employee, who reaps the

16    benefits of increased flag hours regardless of the actual amount of hours worked," and

17    holding that plaintiff's flat rate wages constitute a "commission"); Pittman v. McClain's

18    R.V., Inc., 2013 WL 12139092, at *11 (E.D. Tex. June 12, 2013) (holding that flag rate

19    system for service technician constituted "bona fide commission rate" where "[a]ll flat-

20    time employees' compensation would . . . be tied to customer demand, the plan would

21    provide performance-based incentives for the employee to increase his or her income,

1   and there would be proportionality between the value of the goods or services sold and

2   the rate paid to the employee.").

3           TBC contends that its compensation plan is analogous to these plans.  ECF No.

4   152 at 14.  However, none of those cases involved a compensation scheme like TBC's

5   plan, under which the employee's compensation is based on either the industry-accepted

6   Turned Hours Pay or a flat hourly rate multiplied by the number of hours the employee

7   actually worked.  Because TBC's compensation plan involves a scenario where the

8   Turned Hours Pay is not the only compensation method utilized, the court finds that

9   TBC's compensation plan is distinguishable from the plans in Parker, Yi, Klinedinst, and

10  Pittman.

11          Plaintiffs argue that because TBC's compensation plan utilized an hourly rate

12  floor when it didn't utilize the Turned Hours Pay, the plan is comparable to the

13  commission rate utilized by the employers in Herman v. Suwannee Swifty Stores, Inc.,

14  19 F. Supp. 2d 1365 (M.D. Ga. 1998).  The court is not persuaded.  In Herman, the DOL

15  had investigated the plan at issue and found that it was in violation of the FLSA.  Id. at

16  1368.  Here, the DOL previously investigated this plan and found that it did not violate

17  the FLSA.  ECF No. 99-1.  In Herman, nearly 70% of all employees under the

18  compensation scheme never received more than the guaranteed rate for all hours worked

19  during the entire period in question.  19 F. Supp. 2d at 1371.  Here, only three of

20  plaintiffs remaining, or less than 10%, never received more than the guaranteed rate for

21  all hours worked.[3]  ECF No. 152-13; ECF No. 153-13.  Finally, there is no evidence that

---

[3]  Of the plaintiffs who opted-in within the two-year statute of limitations, only Andrew Gordon, Dawn Dewey, and Bryan Dawson, Jr. never received more than the guaranteed rate for all hours worked.  ECF No. 152-13; ECF No. 153-13.

1   the employer in <u>Herman</u> utilized a method like the Turned Hours Pay when it did not

2   implement compensation on a fixed hourly rate basis.  This clearly distinguishes the TBC

3   compensation plan from the plan examined in <u>Herman</u>.

4         At times, TBC utilizes a "straight commission without advances" compensation

5   method that is a bona fide commission rate.  § 29 C.F.R. § 779.413(a)(4); <u>Viciedo</u>, 246 F.

6   Supp. 2d at 896.  At other times, TBC utilizes a "straight hourly rate" compensation

7   method which is not a bona fide commission rate.  § 29 C.F.R. § 779.413(a)(1); <u>Viciedo</u>,

8   246 F. Supp. 2d at 896.  Thus, TBC utilizes a hybrid plan.  Although a compensation

9   scheme that combines features of a salary plan under § 779.413(a)(1) with the

10  components of a commission plan under § 779.413(a)(4) may not be a bona fide

11  commission plan, there is no per se rule that such a combination makes a commission

12  plan not bona fide.  <u>Crawford v. Saks & Co.</u>, 2016 WL 3090781, at *7 (S.D. Tex. June 2,

13  2016).  Because TBC's compensation plan utilizes a hybrid method for commission rates,

14  the court finds that it needs to look beyond § 29 C.F.R. § 779.413(a) to determine if TBC

15  utilizes a bona fide commission rate.

16                    **b.  <u>Casanova</u> Test**

17        The aggregated factor test established in <u>Casanova</u> does not lead to a clear

18  determination of whether or not TBC's commission rate is bona fide.  The first two

19  factors of the <u>Casanova</u> test, while not dispositive, are given the most weight in

20  determining if a commission rate is bona fide.  2016 WL 1241548, at *8.  However, the

21  outcome of the analysis changes depending on which component of TBC's hybrid

22  compensation plan is being utilized.  When compensation is calculated based on the

23  Turned Hours Pay, both the "proportionality" factor and "decoupled from actual work

1    time" factor weigh in TBC's favor.  However, both of those factors weigh in plaintiffs'

2    favor when compensation is calculated based on the fixed hourly rate multiplied by the

3    number of hours worked.  Although the third and fourth factors, whether the work is of a

4    "peculiar nature" and if the plan "offends the purposes of the FLSA", respectively, weigh

5    slightly in favor of TBC, neither factor is so substantially in TBC's favor as to be

6    determinative for the outcome of the court's analysis.  Therefore, the court finds that it

7    cannot rely solely on the <u>Casanova</u> test to makes its determination of whether TBC

8    utilizes a bona fide commission rate.  The court now turns its attention to § 779.416(c)

9    and the "smell test" to determine if TBC utilizes a bona fide commission rate.

10            **c.  § 779.416(c) and the "Smell Test"**

11        Having found other methods for determining a bona fide commission rate

12    inconclusive, the court turns its attention to § 779.416(c) and the "smell test".  Plaintiffs

13    argue that the court should find TBC's commission rate does not comply with

14    § 779.416(c) because its employees' rate of pay does not change as a result of the

15    commission rate.  ECF No. 153 at 17.  Plaintiffs also contend that TBC did not set their

16    commission rate in "good faith" and that as a result, the commission rate does not pass

17    the "smell test" of a bona fide commission rate.  <u>Id.</u> at 16, 19.  TBC maintains that the

18    correct interpretation of § 779.416(c) focus not on the rate of pay but on the fact that

19    plaintiffs' weekly pay fluctuated and was not fixed as a result of the commission rate.

20    ECF No. 152-1 at 15.  TBC argues that because plaintiffs weekly pay fluctuates, their

21    commission rate is bona fide.

22
23
24
        A commission rate is not bona fide if the formula for computing the
commissions is such that the employee, in fact, always or almost always
earns the same fixed amount of compensation for each workweek (as would

be the case where the computed commissions seldom or never equal or exceed the amount of the draw or guarantee).

29 C.F.R. § 779.416(c). The "smell test" requires the court to "reach[] beyond the formal structure of the commission rate and into its actual effects and the purpose behind it." Erichs, 128 F. Supp. 2d at 1260. To accurately assess these facts under the "smell test," the court cannot divorce the "fluctuating weekly payment" argument from the "seldom or never exceed the guarantee amount" argument. To do so would not allow the court to reach beyond the formal structure of TBC's commission rate.

Looking at TBC's commission rate as whole, it passes the "smell test." Plaintiffs rely on Erichs to argue that TBC did not set its commission rate in good faith. ECF No. 153 at 19. In Erichs, the employer originally had a salary-plus-commission plan that capped a store manager's salary at a particular amount, and when that plan's legality was challenged under state law, the employer changed its plan to a new structure that was effectively the same as the original plan. 128 F. Supp. 2d at 1257–58. The court in Erichs held the evidence that the new plan replicated the original, illegal plan, offered a factual dispute material to deciding whether the second plan was made in good faith. Id. at 1260–61. Unlike Erichs, there is no evidence in the present record that TBC's plan was designed to replicate a previous illegal plan or that TBC otherwise acted in bad faith. As stated previously, TBC's corporate counsel worked with the DOL during an investigation of their compensation plan and an audit revealed no violations of the FLSA. ECF No. 99-1. Furthermore, only four of the remaining plaintiffs never exceeded the guarantee or only exceeded the guarantee one time, and each of the plaintiffs had a non-fixed amount of pay for each work week. TBC's most efficient mechanics over the last five years earned between $118,000 and $286,000 per year under the pay plan, with

1    mechanics across the plan averaging an hourly rate of $17.26.  ECF No. 159-1 at 1.  This

2    demonstrates that the plan is aligned with the purposes of the FLSA.  See 29 U.S.C.

3    § 202(a).  Even counsel for plaintiffs concedes that "the sky is the limit" regarding

4    compensation for TBC employees under the compensation plan.  ECF No. 152-10 at 52.

5    This is sufficient for the court to find that TBC set its commission rate in good faith.

6    However, that does not mean that TBC's commission rate was always bona fide.

7         Courts performing their analysis under the prior narrow reading standard in place

8    before Encino Motorcars, LLC, set a range of percentages that constitute "seldom" when

9    determining whether a compensation plan utilizes a bona fide commissions rate.  In

10   Herman, never exceeding the guarantee or only exceeding it once a year was "clearly

11   not" a bona fide commission rate.  19 F.Supp.2d 1365 at 1371.  However, the Herman

12   court rejected a holding that exceeding the guarantee 10% of the time or less constituted

13   "seldom" as a matter of law in spite of the DOL arguing the court should grant summary

14   judgment in favor of the employees when the commission rate only exceeded the

15   guarantee 10% of the time or less.  Id.  In McAninch, the court found that where an

16   employee's compensation only exceeded the guarantee 19% of the time such a

17   commission rate "easily constitute more than seldom" and was therefore, bona fide.  799

18   F. Supp. 2d at 813.  In Lee v. Ethan Allen Retail, Inc., although the employee only

19   exceeded the draw 28% of the time and the employee's pay never increased even when it

20   exceeded the draw, the court found the commission rate the employer utilized to be a

21   bona fide commission rate in part because the employee did not always or almost always

22   earn the same fixed amount each week and the plan provided the employee the

1  opportunity to work more in order to earn more.  651 F.Supp.2d 1361, 1364, 1367 (N.D.

2  Ga. 2009).

3         In short, even under a narrow reading of what constitutes "seldom," courts have

4  found that exceeding the guarantee in wages only 19% of the time "easily constitutes

5  more than seldom" and rejected a holding that exceeding the guarantee in wages only

6  10% of the time was per se "seldom".  Under the now required fair reading standard

7  established in Encino Motorcars, LLC, the court interprets these holdings to stand for the

8  proposition that if an employee exceeds the guarantee in wages more than 10% of time,

9  that employee has a wage that exceeds the amount of the draw or guarantee more often

10  than seldom.  Twenty-two of the remaining plaintiffs exceeded the guarantee more than

11  10% of the time, had a non-fixed amount of pay for each week, and had been paid under

12  a compensation plan that would increase their pay if jobs were completed more

13  efficiency.  Under the now-required fair reading standard established in Encino

14  Motorcars, LLC, the court finds that TBC utilized a bona fide commission rate for these

15  employees as a matter of law.  As a result, these twenty-two plaintiffs had commissions

16  representing more than 50% of their wages.

17         Four of the remaining plaintiffs never exceeded the guarantee or only exceeded

18  the guarantee one time.  The court finds that for these employees, the TBC compensation

19  plan did not utilize a bona fide commission rate as a matter of law.  There are five

20  remaining plaintiffs that only exceeded the guarantee between 6%-10% of the time.

21  Plaintiffs contend that the limitations on exceeding the guarantee were based on these

22  plaintiffs' inability to select which jobs they would work on and the locations where they

23  each worked not having enough customers to allow them to shift to the Turned Hour Pay

1    compensation system.  ECF No. 153 at 20.  TBC argues that the limitations on exceeding

2    the guarantee is because those individual employees did not work efficiently.  ECF No.

3    152-1 at 10, 27; ECF No. 159 at 2.  Because the question of how employees spend their

4    working time is a question of fact, <u>Icicle Seafoods, Inc.</u>, 475 U.S. at 714, and there is a

5    genuine dispute over these facts, summary judgment for these plaintiffs is inappropriate.

6         Therefore, the court grants in part and denies in part TBC's motion for summary

7    judgment, and the court grants in part and denies in part plaintiffs' motion for summary

8    judgment.  The court grants summary judgment in favor of TBC for plaintiffs Faton

9    Bajrami, Lanny Bauyan, Jack Clark, Scott Flamholtz, Juan Lopez, Raymond Mackinlay,

10    Alex Officer, Matthew Perez, Leonard Purvee, Taylor Hooks, Adam Claypool,

11    Francinildo Silva, David Leininger, Peter Gilzene, Jeffrey Walker, Carlos Guzman, Cole,

12    Fernando Rivera, Christopher Mitchum, Robert Withrow, Jonathon Jimenez, and Duston

13    Everett.  The court grants summary judgment in favor plaintiffs for Perry Shockley,

14    Bryan Dawson, Jr., Dawn Dewey, and Andrew Gordon.  The court denies summary

15    judgment for both TBC and plaintiffs for Thomas Clark, James Hardenbrook, Rashaad

16    Collins, Frederick Schultz, and Kenny Schultz.

17    **B.  Decertification**

18         At this "decertification stage" the court applies a heightened, fact-specific

19    standard to the "similarly situated" analysis, <u>Regan</u>, 2014 WL 3530135, at *3, and

20    considers various additional factors, including: (1) the disparate factual and employment

21    settings of the individual plaintiffs; (2) the various defenses available to defendants that

22    appear to be individual to each plaintiff; and (3) fairness and procedural considerations.

23    <u>Gordon</u>, 134 F. Supp. 3d. at 1032.  If the court determines that the plaintiffs are not, in

fact, similarly situated, the court may decertify the class, dismiss without prejudice the opt-in plaintiffs' claims, and permit the named plaintiffs to proceed on their individual claims.  Holmes v. Charleston Retirement Investors, LLC, 115 F. Supp. 3d 653, 657 (D.S.C. 2014).  The complaint identifies three different locations where the named plaintiffs worked.  ECF No. 1.  All three factors for decertification are dependent on whether the remaining plaintiffs all worked at the same locations and/or if the policy for assigning work was the same for all locations.  At this time, the court does not know whether the five remaining plaintiffs all worked at the same locations or if the policy for assigning work was the same for all locations.  The court takes under advisement the motion for decertification and asks both parties to submit additionally briefs in detailing the factual and employment setting of the individual plaintiffs including detailing the process for how work is assigned.  Briefs shall be filed no later than 14 days from the filing of this order.

# IV.   CONCLUSION

For the reasons set forth above, the court grants in part and denies in part TBC's

motion for summary judgment, and the court grants in part and denies in part plaintiffs'

motion for summary judgment, and takes under advisement on TBC's motion for

decertification until additional briefs are filed.

**AND IT IS SO ORDERED.**

_____

**DAVID C.  NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 16, 2020**
**Charleston, South Carolina**